## Case No. 1,007.

### BARNARD et al. v. NORWICH & W. R. CO. et al.

[4 Cliff. 351;[1] 14 N. B. R. 469; 3 Cent. Law J. 608; 5 Amer. Law Rec. 361; 22 Int. Rev. Rec. 312.]

Circuit Court, D. Massachusetts. May Term, 1876.

RAILROAD COMPANIES—MORTGAGE—AFTER-AC-QUIRED PROPERTY—LEASED LINES.

1. The Boston, Hartford, & Erie Railroad executed a mortgage, called the Berdell mortgage, and issued bonds for certain specific purposes, under which the individual defendants were trustees, and in possession of the leasehold interest. Afterwards the Norwich & Worcester Railroad Co. was leased to the Boston, Hartford, & Erie Co. Afterwards the Boston, Hartford, & Erie was declared bankrupt during the existence of the Norwich & Worcester lease. Bill in equity was brought by the assignees in bankruptcy of the Boston, Hartford, & Erie Road, praying that the trustees under the mortgage might be decreed to pay to the assignees all the profits and moneys received by them, and to deliver the leasehold interest of the said road; and that the Norwich & Worcester Road should pay over all moneys by it received under the lease. *Held*, the prayer of the bill must be denied, because the leasehold interest acquired by the lease passed to the trustees as after-acquired property.

[2. A mortgage of all the property of a railroad company then in its possession or thereafter acquired includes another railroad subsequently leased to the mortgagor, and the title to such leased road is good in the hands of the trustees under the mortgage, as against the subsequent assignees in bankruptcy of the mortgagor.]

3. In equity the rule is, that when parties intend to create a lien upon property, not then in actual existence, it attaches as soon as the person who grants the lien acquires the possession and title of the same.

[In equity. Bill by George M. Barnard, Charles S. Bradley, and Charles R. Chapman, assignees in bankruptcy of the Boston, Hart-

ford & Erie Railroad Company, against the Norwich & Worcester Railroad Company, W. T. Hart, G. T. Oliphant, and C. P. Clark, trustees under a mortgage of the property of the Boston, Hartford & Erie Railroad Company, praying that respondents account for all moneys and profits received by them as lessees and managers of the property of the Norwich & Worcester Railroad Company, and that they be ordered to deliver to complainants their leasehold interests therein, and release and convey to complainants whatever title they may have to such leasehold interests. Bill dismissed.]

The complainants were the assignees in bankruptcy of the Boston, Hartford, & Erie Railroad Co., and the respondents were the Norwich & Worcester Railroad Co., and William T. Hart and Charles P. Clark, surviving trustees, under the indenture known as the Berdell mortgage. The first-named railroad company was incorporated on the 25th of June, 1863, under a law of the state of Connecticut, and by divers other laws of said state, and of the states of Massachusetts, Rhode Island, and New York. The said railroad company, on the 19th of March, 1866, executed the indenture known as the Berdell mortgage, under which the respondents, Hart and Clark, as the surviving trustees created by that indenture, were in actual possession of the leasehold interest which was the subject-matter of the controversy. Twenty thousand bonds, of $1,000 each, were issued by the said railroad company "for the purpose of paying the existing debts of the company and of completing and equipping their road." Interest at the rate of seven per cent. per annum was payable semi-annually on the first days of January and July in each year, on the presentation and delivery of the proper annexed interest-warrants. Payment of the principal was deferred until Jan. 1, 1900. To secure the payment of principal and interest, the railroad company executed an indenture known as the Berdell mortgage, under which the two individual respondents were the surviving trustees. By the terms of the instrument, the grantors conveyed all the railways of the corporation, commencing at the foot of Summer street, Boston, and running to Willimantic, in the state of Connecticut, through Thompson in that state, and commencing at Providence and running to Willimantic, and also commencing on the northerly side of the city of Boston, and running through Woonsocket, in the state of Rhode Island, to Willimantic, and thence through the state of Connecticut and a portion of the state of New York, to the western terminus of the location of the railway of the company on the east bank of the Hudson river, at Fishkill; also, running from Willimantic to New Haven; "also, from a point on said railway, in said Thompson, to Southbridge, in the state of Massachusetts. As said railways are now, or shall be located, constructed, or improved under or by virtue

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

of any powers now granted, or that may hereafter be granted or obtained to locate, construct, or use a railroad on any of said indicated lines, with all the lands that are included, or may be included in the location of said railway, or acquired for the uses of said company within the terminal points aforesaid, but not including the lands at the termini at Boston and at Fishkill, which are outside of the location of said railroad, together with all their lands, tracks, lines, rails, bridges, ways, depots, stations, water-tanks, shops, buildings, piers and wharves, erections, fences, walls, fixtures, privileges, franchises, rights, leases, and charters; also, all the like estate, roads, railroads, and structures, and matters and things pertaining or belonging thereto, that may be hereafter acquired or constructed, or belong to or be controlled by the party of the first part. Together with all the tolls, income, issues, and profits to be had from the same, and all rights to receive and recover the same, and everything necessary for the complete use of the road; also all the locomotives, engines, tenders, cars, carriages, tools, shops, fixtures, and machinery, and all the coal, wood, and other fuel belonging or appertaining to said railroad, or that may at any time hereafter belong or appertain to the same, as it may be changed by use and new acquisitions; also all the estate, real, personal, and mixed, of any of the foregoing descriptions, or of any other kind which may be hereafter acquired by the party of the first part, and used or intended to be used in the construction and operation of the said railroad."

An agreed statement of facts was filed, of which the following are the essential facts, so far as the same is related to the opinion of the court and the view of the case taken therein. At all times since the execution of said lease, the railroad of the Norwich & Worcester Railroad Co. has been used, among other purposes, for the transportation of passengers and freight between Boston and New York, by the line of the Boston, Hartford, & Erie Railroad from Boston to Putnam; thence by the Norwich & Worcester Railroad to Norwich; thence by that portion of the New London Northern Railroad, used under said lease (or by some other track used under said lease) to Long Island sound; and thence by the line of steamboats referred to in said lease; and said line has been used as a continuous through line from Boston to New York, operated by and under the control of the Boston, Hartford, & Erie Railroad Co., or the receivers or the trustees who have been in possession of the property of the Boston, Hartford, & Erie Railroad Co.; and the said leased property also forms a continuous through line from New York to Worcester, and connecting points north. It is also agreed that each of the roads herein referred to forms the usual railroad connections with the roads of corporations not owned by the Boston, Hartford, & Erie Railroad

Co., or its successors or assigns, which intersect or touch its line, and among others with the Shore Line Railroad, so called, at New London, leading to New Haven, and there connecting with the New York & New Haven Railroad, forming a continuous line of rail to New York.

It is agreed that on the 21st of October, 1870, a petition was filed in the district court of the United States for the district of Massachusetts by Seth Adams, a creditor, praying that the Boston, Hartford, & Erie Railroad Co. might be adjudged bankrupt. [A motion to dismiss the petition was denied. Adams v. Boston, H. & E. R. Co., Case No. 47.] This petition was opposed, and the questions raised by it were pending in said court until March 2, 1871, when said company was adjudicated a bankrupt in said district, [unreported;] and at the first meeting of the creditors of said bankrupt corporation, held March 18, 1871, the plaintiffs were appointed assignees of said bankrupt's estate, and they derive powers and authority from the proceedings in said cause in said district. A petition in review was brought in the circuit court for said district, March 18, 1871: and the same, after a hearing, was dismissed, Sept. 7, 1871. [Sweatt v. Boston, H. & E. R. Co., Case No. 13,684.] On the 20th day of December, 1870, a petition was filed, seeking to put said Boston, Hartford, & Erie Railroad Co. into bankruptcy, in the district of Connecticut, by James Alden, a creditor of said company; and on the 31st day of December, a like petition was filed in the district court for the southern district of New York by the said Alden, and said corporation was adjudicated a bankrupt in said district of Connecticut, March, 1871; and in said district of New York by a decree filed March 3, 1871, and made, as stated in the opinion of Judge Woodruff, in 9 Blatchf. 409. [In re Boston, H. & E. R. Co., Case No. 1,678.] In the district of Connecticut, the complainants were also appointed assignees; and in the district of New York, the complainants were chosen assignees; but the district judge refused to confirm the election. [In re Boston, H. & E. R. Co., Case No. 1,680.] Petitions in review were filed in the circuit court in each of said districts of New York and Connecticut, asking for a stay of the proceedings therein, on the ground of the priority of the proceedings in the Massachusetts district; and in September, 1871, a decree was entered upon said petition in the district of Connecticut; and on the 22d of February, 1872, upon said petition, in the district of New York, by the circuit judge, sustaining the same, and staying the said proceedings in both of said districts; for a further statement of which, reference may be had to the opinions of Judge Woodruff, in 9 Blatchf. 102, 409, [In re Boston, H. & E. R. Co., Cases Nos. 1,677 and 1,678.]

Some time after the bringing of the bill, Oliphant deceased.

C. S. Bradley and J. J. Storrow, for complainants.

The first question is, whether this leasehold interest is included within the description of the property conveyed by that mortgage. The complainants submit that it is not. A well-known rule of law is, that general language, following clear words of specific description, does not extend beyond items ejusdem generis with those enumerated; it merely cures a defective enumeration of details constituting the class intended to be included in the specific description. Rooke v. Kensington, 2 Kay & J. 753; Jenner v. Jenner, L. R. 1 Eq. 361; City of Philadelphia v. Philadelphia & R. R. Co., 58 Pa. St. 253; Parish v. Wheeler, 22 N. Y. 494. Another rule of ancient origin, but frequently applied to railroads in recent cases, is founded upon the well-known distinctions as to grants of after acquired property. 2 Kent, Comm. 468. A conveyance by a railroad company, prima facie, at least, and in the absence of clear and unequivocal expressions of a contrary intention, will only embrace such after-acquired property as will come to the corporation under the powers conferred by its existing charter, or at most under amendments made to enable it to carry out and perfect the scheme embodied in that charter. Seymour v. Canandaigua & N. F. R. Co., 25 Barb. 284, and cases cited. Bath v. Miller, 53 Me. 308. So a grant to a railroad corporation of a right to use a patent, or of an exemption from taxation, relates only to the line of road within its existing charter, and does not cover extensions acquired by consolidation or otherwise in pursuance of laws afterwards passed. Emigh v. Chicago, B. & Q. R. Co., [Case No. 4,448;] Tomlinson v. Branch, 15 Wall. [82 U. S.] 464.

W. G. Russell and R. R. Bishop, for respondents.

That after-acquired property will pass, when apt words are used for its conveyance, under a railway mortgage, is now settled beyond controversy. For a statement of the principles of law on which this question has been settled, to which we may have occasion to refer in dealing with the construction and effect to be given to the Berdell mortgage, we cite Pennock v. Coe, 23 How. [64 U. S.] 117; Galveston, H. & H. R. Co. v. Cowdrey, 11 Wall. [78 U. S.] 459; Willink v. Morris Canal & Banking Co., 3 Green, Ch. [4 N. J. Eq.] 377, 402; Phillips v. Winslow, 18 B. Mon. 431; Stevens v. Watson, 4 Abb. Dec. 302; Howe v. Freeman, 14 Gray, 577; Pierce, R. R. 530; Morrill v. Noyes, 56 Me. 458; and especially, as the leading case, in which the true principle has been most fully elaborated by C. J. Perley, Pierce v. Emery, 32 N. H. 484. To the point that subsequent legislative sanction renders valid a railroad mortgage of after-acquired property, Howe v. Freeman, 14 Gray, 577; Shepley v. Atlantic & St. L. R. R. Co., 55 Me. 407.

The lease in question is included and conveyed in express terms in the description of after-acquired property set forth in the Berdell mortgage. The description of the property conveyed first includes "all and singular the railways of said Boston, Hartford, and Erie Railway Company," and proceeds to describe those railways as then chartered and located within certain defined termini and on certain indicated lines; but enlarges the grant beyond their then existing location by adding the words, "as said railways are now or shall be located, constructed, or improved, under or by virtue of any powers now granted, or that may hereafter be granted or obtained, to locate, construct, or use a railroad on any of said indicated lines;" it then conveys all the lands included or which may be included in said locations made or to be made, and all lands which may be acquired within the same terminal points, with one specific exception, the purpose of which is obvious. Next follows what was evidently intended to be a specific enumeration of all the classes and descriptions of property which the railroad corporation might be supposed to own at the time, including and ending with its "privileges, franchises, rights, leases, and charters." Any existing lease held by the corporation then clearly passed under the mortgage. Then follows a less specific, but not less broad and comprehensive, series of terms, evidently intended to take the place of the above enumeration, and to include and apply it to after-acquired property of the corporation; viz. "all the like estate, roads, railroads, and structures, and matters and things pertaining or belonging thereto, that may be hereafter acquired, or constructed, or belong to, or be controlled by the party of the first part." The word "estate" is in itself, perhaps, the most broad and comprehensive word which can be used descriptive of property, the subject-matter of a conveyance, and beyond question includes a lessee's title. Boston v. Dedham, 4 Metc. [Mass.] 178; Bouv. Dict. tit. "Estate." In fact, the true rule of construction of the terms of grant of the after-acquired property is to treat them as a new and repeated enumeration of the terms in which the existing property was described, and therefore as if the word "leases" were again specified. Nor can the word "like" be held to limit and restrict the words which follow it so as to confine their application to property which may be acquired within the terminal limits set forth in the specific description of the existing property. This is apparent when we consider its force as applied to the word "railroads." The specific description already included all roads which were or could be located within those termini. The phrase "like railroads" can therefore only have effect at all by construing it to mean other railroads, which may be acquired or constructed outside the indicated lines and outside the specified termini.

An after-acquired lease is also within the plain and ordinary meaning of the subsequent terms of the grant, viz. "also all the estate, real, personal, and mixed, of any of the foregoing descriptions, or of any other kind which may be hereafter acquired by the party of the first part, and used or intended to be used in the construction and operation of the said railroad." Even if the after-acquired lease of the Norwich and Worcester Railroad was not designated in advance by specific and express terms of description in the mortgage grant, it passed under the general and broad signification which a proper construction will give to the terms used. It cannot be questioned that the words of the grant were intended (with the exception of terminal lands) to pass all the existing property, and, without exception, all the existing franchises of the corporation. It is equally clear that they were intended to include after-acquired franchises. They conveyed, in express terms, railways to be "located, constructed, or improved under or by virtue of any powers now granted, or that may hereafter be granted;" they conveyed "franchises, rights, and charters" and the like "estate, . . . matters, and things" hereafter acquired; and in the later clause of the grant, the right to receive and recover tolls, which is one of the main franchises of a railroad, followed by apt words to extend the grant to like after-acquired franchises. The better considered opinions of the judicial tribunals sustain the title to after-acquired property under railway mortgages upon the principle that an authorized conveyance of the franchise and corporate rights of such a corporation, with its road and other property, vests in the grantee a title to the after-acquired property as an incident and accession to the thing originally granted. "The right to take and hold property being one of the franchises mortgaged, the corporation would have no power to take or hold property, except by virtue of that franchise, and under the mortgage by which the franchise was covered." "If the directors made such a mortgage, as incident to the franchise and corporate rights mortgaged, subsequently acquired property, immediately upon its vesting in the corporation, would, as an incident and by accession, become part of the thing originally mortgaged, and of the mortgage security." Pierce v. Emery, 32 N. H. 484, 517. "But where the corporation, under competent authority, conveys by mortgage its road and all its property, with all its corporate franchises and rights, as one entire thing, including, among its other franchises, the right to acquire future property; and, in effect, conveys the corporation itself, subsequently acquired property will pass to the mortgagee as an incident and accession to the subject of the mortgage. The right to acquire the property being one of the franchises conveyed, it is included within the mortgage; and property acquired afterwards, by virtue of its exercise, is acquired and held

subject to the conditions of the mortgage." Pierce, R. R. 530.

This principle has also received the sanction of the supreme court of Massachusetts in Howe v. Freeman, [14 Gray, 577,] cited above, where it is said of a vote authorizing the directors "to execute a mortgage of a road with all its franchises:" "The terms were very sweeping, and indicated a purpose to execute a mortgage of the broadest character." See, also, Phillips v. Winslow, ubi supra; Stevens v. Watson, ubi supra. It is, then, no objection to the title of the trustees under the mortgage, that, at the date when the mortgage was made, the franchise which would empower the Boston, Hartford, and Erie Railroad to hold or acquire the lease in question, did not exist. The corporation had the power and capacity to acquire future-added franchises as well as the power to acquire non-existing property which might come into existence. Neither subject of acquisition can be said to have been definitely and in specie a subject of intention or contemplation at the time of the grant, for neither existed.

But when by legislative grant a new and added franchise came into existence, and was annexed to the corporation, the property acquired and held under it became, by accession, an incident to the franchise, annexed to it and to the original franchise as an accession, and became part of the thing conveyed by the original grant, which included, in its express terms, future-acquired franchises, and by its general tenor the capacity and power to acquire them. Under the broad rule of construction adopted in the cases cited, the mortgage was a mortgage of the corporation itself: it conveyed the road and all its franchises existing, or to be acquired, as one entire thing, and, as an incident and accession, all after-acquired property of the corporation. The legislative sanction given to the lease either presumed or created the franchise to hold it in the corporation; and by that act it passed under the mortgage, if it had not already passed under it at its inception. Act Mass. 1869, c. 406, Record, p. 167; Act Conn. 1869, Record, p. 398; Howe v. Freeman, ubi supra; Shepley v. Atlantic & St. L. R. R. Co., ubi supra. The Boston, Hartford, and Erie Railroad Co., like all railroad corporations of modern date, held its charter subject to amendment, alteration, or repeal by legislative enactment. The legislature saw fit to enlarge its charter and its franchise, giving it an added power, and imposing upon it an added duty. Can it be contended that under a mortgage of its charter and its franchise, which mortgage has itself become part of the statute law, the enlargement of the charter and the franchise does not pass, but becomes severed from the original grant?

If we adopt the theory as to the passing of after-acquired property under railway mortgages, suggested by Mr. Justice Bradley in

Galveston R. Co. v. Cowdrey, 11 Wall. [78 U. S.] 459, 481, viz., that the title passes by estoppel, the rule of construction to be adopted is none the less liberal. The plaintiffs take, and can enforce no better title than the bankrupt corporation could itself claim. Ex parte Dalby, [Case No. 3,540.] And all the considerations presented as to the broad construction of the language used in determining the general intent of the parties apply most strongly against the grantor in the deed.

CLIFFORD, Circuit Justice. Assignees in bankruptcy, except in cases of fraud, take only such rights and interests in the property of the bankrupt as he himself had, and could have himself claimed and asserted at the time of his bankruptcy, and they are affected with all the equities which would affect the bankrupt himself if he were asserting those rights and interests. No person can sell a thing he does not own, unless as the duly authorized agent of the owner. Nemo dat quod non habet. Nor can he convey in praesenti property not in existence, the rule being that every such deed or mortgage is inoperative and void. Authorities to support these propositions are not wanting, but the law will permit the grant or conveyance to take effect upon property when it is brought into existence, and comes to belong to the grantor, in fulfilment of an express agreement, if the agreement is founded on good and valuable consideration, unless it infringes some rule of law, or will prejudice the rights of third persons. Pennock v. Coe, 23 How. [64 U. S.] 117. Whenever the parties by their contract intend to create a lien or charge, either upon real or personal property, whether then owned by the assignor or contractor or not, or if personal property, whether it is in esse or not, it attaches in equity as a lien or charge upon the particular property as soon as the assignor or contractor acquires a title thereto against the latter, and against all persons asserting a claim to the same under him, either voluntarily or with notice, or in bankruptcy. Mitchel v. Winslow, [Case No. 9,673.]

Tested solely by the words of the instrument above referred to, it might well be contended that the grant must be limited to the railways then chartered and located on indicated lines within certain described termini, but the terms of the indenture go on immediately to enlarge the grant beyond the locations then existing by adding the words "as said railroads are now or shall be located, constructed, or improved under or by virtue of any powers now granted, or that may hereafter be granted or obtained, to locate, construct, or use a railroad on any of said indicated lines." Subsequent locations, if within the indicated lines, are clearly within the express words of the grant. Reasonable doubt upon that subject cannot be entertained, and the indenture proceeds to convey all the lands that are included, or which

may be included in those locations, made or to be made, and all lands which may be acquired within the same terminal points, with one exception, to wit, the terminal lands at Boston and Fishkill which are outside the location, which it seems were reserved for a separate mortgage to secure an additional loan. Support to the view that the conveyance was intended to include railways to be located and constructed within the terminal points, of the most conclusive character, is derived from what follows in the same indenture, by which the grantors first enumerate as objects of present conveyance "all their lands, tracks, lines, rails, bridges, ways, depots, stations, water-tanks, shops, buildings, piers, and wharves, erections, fences, walls, fixtures, privileges, franchises, rights, leases, and charters," and then superadd, under the same words of grant, "all the like estate, roads, railroads, and structures, matters and things pertaining or belonging thereto, that may be hereafter acquired or constructed, or belong to, or be controlled by the" granting corporation. Search is made in vain for anything to limit or qualify that language. Instead of that, the succeeding paragraph of the grant confirms the theory that the grantors intended that the mortgage should include after-acquired property of the same kind as that they possessed, as well as everything owned by them, then in possession, belonging to the great enterprise in which they were engaged.

Evidence of that intent is also found in the sweeping paragraph which follows in the same instrument, in which the grantors, after having conveyed all the like estate hereafter acquired, proceed to add, "Together with all the tolls, income, issues, and profits to be had from the same, and all rights to receive and recover the same, and every thing necessary for the complete use of the road. Also, all the locomotives, engines, tenders, cars, carriages, tools, shops, fixtures and machinery, and all the coal, wood, and other fuel belonging or appertaining to said railroad, or that may at any time hereafter belong or appertain to the same, as it may be changed by use and new acquisitions; also, all the estate, real, personal, and mixed, of any of the foregoing descriptions, or of any other kind which may be hereafter acquired by the party of the first part, and be used, or intended to be used, in the construction and operation of the said railroad."

Arrangements of various kinds were made by the said railroad company, and on the 9th of February, 1869, they leased for the term of one hundred years the railway of the Norwich and Worcester Railroad Company, together with all lands on which said railway is or shall be located within the described terminal points, and which are connected with the uses of said railway, and all the rights, easements, franchises, and privileges, in connection therewith, or which

are appurtenant thereto, and all the turnouts, branch tracks, depot grounds, stations, depots, superstructures, erections, and fixtures used therewith and belonging thereto, and the lands and premises on which the same are situate and standing, now used and belonging, and to be used or belonging, or in any wise appertaining to said railroad, together with all and singular the real estate, tenements, hereditaments, and appurtenances of the said railway company, together with and also the right to ask, demand, and receive, for their own use and benefit, all the tolls, profits, income, and rent, and charges which may or can be legally demanded or received, for the transportation of persons or property upon or over the said railroad, or any part thereof, or resulting in any wise from the operations and working of said railroad, or the use and occupation of the demised property, or any part thereof, together with the use of all the personal property of the said company, used or to be used upon or in connection with said leased railroad, with the dividends and profits of the steamboat stock owned by the said railroad company, and "the shares in the stock of said company."

Much discussion of the question whether the Boston, Hartford, and Erie Railroad Company had authority at the time to enter into that indenture is wholly unnecessary, as it is admitted that their act in so doing was fully ratified and confirmed by the laws of the states of Massachusetts and Connecticut. See Laws Mass. 1866, p. 142; Laws Conn. 1869, p. 264. Even the complainants concede that it was competent for the state legislatures to ratify and confirm the lease, and, the court being of the same opinion, the point may be dismissed without further consideration. Tested alone by the terms of the lease, wholly independent of the indenture of mortgage aforesaid, it is clear that the conclusion must be that the right of possession and use of the leasehold estate, real, personal, and mixed, passed to the respondent lessees named in the lease, which is a proposition virtually admitted by both the parties in this controversy. Intervening facts, however, are necessary to be considered in order to a complete understanding of the matters in dispute. Both parties concede that the Boston, Hartford, and Erie Railroad Company was adjudged bankrupt, and that the complainants, on the 21st of October, 1870, were duly appointed assignees of the estate of the bankrupt corporation, and the record shows that the complainants, as such assignees, claim that the estate of every kind acquired by the said lease passed to the corporation whose estate they represent under the bankrupt act. Opposed to that, the individual respondents claim that the leasehold estate, demised and leased to the bankrupt corporation, passed to them as the legal trustees of the bondholders under the indenture known as the Berdell mortgage. Pursuant to the theory of the bill of complaint, the complainants pray that the individual respondents and the respondent corporation may account to the complainants for all moneys, rents, issues, and profits received by them, and that they respectively may pay to the complainants all such sums as shall be found due on such accounting, and that they may be ordered to deliver to the complainants the said leasehold interests, and to release and convey to the complainants whatever apparent or nominal title they may have to such leasehold interests.

Service was made, and the respondents Hart and Clark appeared and filed an answer. They admit that the Boston, Hartford, and Erie Railroad Company was duly incorporated; that the corporation executed the indenture known as the Berdell mortgage; that the individual respondents are the sole surviving trustees under the same, and that the mortgage is a valid mortgage, duly authorized and ratified by the said several states; that the said corporation and the Norwich and Worcester Railroad Company entered into the agreement of lease as alleged in the bill of complaint; that the corporation lessee under that lease was subsequently adjudged bankrupt, and that the complainants were appointed assignees of the estate of the bankrupt corporation. Moneys, it may be assumed, were received by the lessors of that railroad, from the traffic, rents, and profits of the same, but the individual respondents deny that it was the duty of the said lessors to account for or pay over the same to the complainants, and they assert that they claim that the said lease and the benefit thereof passed to the trustees under the said indenture of mortgage, and that they, as such trustees, are entitled to require said lessors to account and pay all such moneys to them, as after-acquired property, under the indenture known as the Berdell mortgage. Other grounds of claim and of defence are set up in the pleadings growing out of the decree of the state court, but, in the view taken of the case, the whole merits of the controversy must turn upon the question whether the leasehold interest acquired by the lease passed to the trustees under the mortgage as after-acquired property. Plainly, if those interests did pass to the trustees as after-acquired property, the bill of complaint must be dismissed, and, if they did not, it is equally clear that the complainants are entitled to a decree, and in that view it follows that the other issues of law may be dismissed without further consideration. Argument to show that the parties intended to create a lien or charge upon property of the kind enumerated subsequently acquired, as well as upon property in existence and in actual possession, is hardly necessary, as the affirmative of the proposition is supported by the express words of the indenture of mortgage, the rule being that when parties intend to create a lien upon property not

then in actual existence, it attaches in equity as soon as the person who grants the lien acquires the possession and title of the same. Mitchel v. Winslow, [Case No. 9,673;] Pennock v. Coe, 23 How. [64 U. S.] 117.

Privileges, franchises, rights, leases, and charters are included in the mortgage, as well as lands, tracks, lines, rails, bridges, ways, depots, stations, water-tanks, shops, buildings, piers, wharves. erections, fences, walls, and fixtures; and the instrument following that specific enumeration proceeds to provide "also all the like estate, roads, railroads, and structures, and matters and things pertaining or belonging thereto, that may be acquired or constructed, or be controlled by the granting party, together with all the tolls, income, issues, and profits to be had from the same, and every thing necessary for the complete use of the railroad." Language more explicit and comprehensive could not well be chosen, and the instrument proceeds to another enumeration, and specifies all the locomotives, engines, tenders, cars, carriages, tools, shops, fixtures, and machinery, and all the coal, wood, and other fuel belonging or appertaining to the said railroad, or that may at any time hereafter belong or appertain to the same as it may be changed by use and new acquisitions. More specific terms of inclusion, it would seem, could not be employed, and yet the grantors, as if to make certainty doubly sure, add as follows: "also, all the estate, real, personal. and mixed, of any of the foregoing descriptions, or of any other kind which may be hereafter acquired by the granting party and be used, or intended to be used, in the construction and operation of the said railroad." Leases are specifically named as matters conveyed by the mortgage, and the express words of the instrument are, that all the estate, real, personal, and mixed, of any of the descriptions mentioned, or of any other kind which may hereafter be acquired by the grantors. or be used or intended for use, in the construction or operation of the said railroad, shall also pass to the mortgagees under the mortgage. Suppose that is so, the rule established by the two leading cases already cited shows that the complainants cannot recover. It must be so, unless the rule promulgated in those cases is overruled, which cannot be done for at least two reasons, (1) because the rule is a sound one; (2) because it is supported by many other decisions, to a few of which only reference will be made. Dunham v. Cincinnati, P. & C. R. Co., 1 Wall. [68 U. S.] 267; Galveston R. R. v. Cowdrey, 11 Wall. [78 U. S.] 481; U. S. v. New Orleans R. Co., 12 Wall. [79 U. S.] 364; Butt v. Ellett, 19 Wall. [86 U. S.] 547; Willink v. Morris Canal & Banking Co., 3 Green, Ch. [4 N. J. Eq.] 395; Smithurst v. Edmunds. 1 McCart, Ch. [14 N. J. Eq.] 411; Pierce v. Emery, 32 N. H. 503.

Many other authorities support the proposition that, whenever parties by their contract intend to create a positive lien or charge, either upon real or personal property, whether owned by the assignor or contractor or not, or, if personal property, whether it is then in being or not, the contract attaches in equity, as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto. Seymour v. Canandaigua & N. F. R. Co., 25 Barb. 284; Curtis v. Auber, 1 Jac. & W. 531; Langton v. Horton, 1 Hare, 556; Field v. Mayor, 2 Seld. [6 N. Y.] 185. Apply the established rule to the case, and it is clear that the complainants cannot recover, and in that view the court is of the opinion that it is not necessary to examine the other questions discussed at the bar.

Decree that the bill of complaint is dismissed, with costs.