## GAGE LUMBER CO. v. McELDOWNEY.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1913.)

No. 2,276.

1. BANKRUPTCY (§ 140*)—PASSING TITLE.

Complainant purchased lumber of specified quantities, dimensions, kinds, and prices per 1,000 feet from the bankrupt, to be manufactured subject to guaranteed freight rates and inspection, the contract providing for an advancement of $30,000 in notes and payment half cash on each invoice as rendered, the balance to apply on payment of the notes given, to continue until the advancement was paid, after which the invoices would be paid in full. *Held*, that title to lumber cut and piled in the yards of the bankrupt, and intended to be appropriated to the contract at the time bankruptcy intervened, had not passed to complainant, so as to entitle it to recover the value of such lumber from the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 188*)—SALES—PROPERTY TO BE MANUFACTURED—EQUITABLE LIEN.

Where complainant purchased a quantity of lumber, to be manufactured and shipped to it by the bankrupt, advancing large sums before the lumber was sawed, complainant acquired an equitable lien on lumber piled in the yards of the bankrupt and intended to be applied on complainant's contract for the balance of advances, etc., which was enforceable as against the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286-289, 291-295; Dec. Dig. § 188.*]

3. BANKRUPTCY (§ 101*)—FILING PETITION—EFFECT—BANKRUPT'S PROPERTY—CUSTODIA LEGIS.

Filing of a petition in bankruptcy is an assertion of jurisdiction by the bankruptcy court, with a view to determining the status of the bankrupt and a settlement and distribution of his estate; the exclusive jurisdiction of the bankruptcy court being so far in rem that the estate is regarded as in custodia legis from the filing of the petition.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 163; Dec. Dig. § 101.*]

4. ASSIGNMENTS FOR BENEFIT OF CREDITORS (§ 185*)—RECEIVERS (§ 76*)—BANKRUPTCY (§ 155*)—TRUSTEE—ASSIGNEE FOR THE BENEFIT OF CREDITORS.

A trustee in bankruptcy, prior to the amendment of Bankr. Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418), by Act June 25, 1910, c. 412, 36 Stat. 838 (U. S. Comp. St. Supp. 1911, p. 1491), an assignee for the benefit of creditors, and a receiver under the state law, took the property of the debtor subject to the rights of third persons; the equitable rights of such persons not being changed by bankruptcy proceedings, but all obligations of a legal or equitable character remaining undisturbed thereby.

[Ed. Note.—For other cases, see Assignments for Benefit of Creditors, Cent. Dig. § 558; Dec. Dig. § 185;* Receivers, Cent. Dig. § 137; Dec. Dig. § 76;* Bankruptcy, Dec. Dig. § 155.*]

5. BANKRUPTCY (§ 161*) — PREFERENCES — SHIPMENT OF GOODS — EQUITABLE LIEN.

Where complainant acquired an equitable lien on certain lumber manufactured for it under a contract of sale executed September 6, 1906, pursuant to which complainant had made large advances to the bankrupts, shipments of consignments under the contract as late as September 9,

1907, prior to the intervention of bankruptcy against the seller in September, 1907, did not constitute a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. § 161.*]

Appeal from the District Court of the United States for the Eastern District of Kentucky; A. M. J. Cochran, Judge.

Proceeding by the Gage Lumber Company against M. T. McEldowney, trustee in bankruptcy of the Clairfield Lumber Company. Decree (194 Fed. 181) for defendant, and complainant appeals. Reversed and remanded.

This appeal presents an issue as to the ownership of two sums of money, one of $7,485.16 and the other of $3,500.47. These sums are the proceeds of sale of certain lumber received by appellant at times and under circumstances which are claimed to differentiate its rights thereto, if, indeed, it is entitled to either sum. The issue as presented and determined below was made to depend upon whether the title to the lumber had passed from the bankrupt to the appellant prior to the bankruptcy. The District Judge believing that the title had not passed, entered an order in favor of the trustee (194 Fed. 181), and hence the appeal.

The controversy grew out of a contract entered into at Providence, R. I., September 6, 1906, which, so far as it is claimed to have been in writing, was in the form of an order given by the L. H. Gage Lumber Company (hereinafter called the Gage Company) to and accepted by the Clairfield Lumber Company (hereinafter called the Clairfield Company); the former being a corporation of Rhode Island, with offices at Providence, and the latter a corporation of Kentucky and then operating a sawmill at Clairfield, in Claiborne county, Tenn. The order so far as necessary to state was in this language:

"As per conversation of same date you will kindly enter our order as follows: [Specifically describing the lumber by quantities, dimensions, kinds and prices per thousand feet.] * * * The above prices f. o. b. Clairfield, Tenn., guaranteed rate of 30½c. to Boston points. * * * Inspection guaranteed on the rules of the National Hardwood Association now in force. We hereby agree to advance on account of said contract in four months paper $10,000, under date of October 1st, $10,000, and under date of November 1st, $10,000; you agreeing at the same time to have put on sticks during the month of September at least $10,000 worth of lumber to apply on our contract, and during the month of October at least $10,000 worth additional, to apply on our contract. You also agree to have an additional $10,000 worth of lumber on sticks by December 1st, making a total of $30,000 worth of lumber which has been put on sticks to apply on our contract of this date. We hereby agree to pay half cash on each invoice as rendered, the balance to apply on the payment of notes given. The same shall continue in this manner until this said advance has been paid in full, after which your invoices will be paid in full."

The Gage Company gave its promissory notes, and they were duly paid. The Clairfield Company began shipping lumber to the Gage Company in October, 1906, and continued its shipments from time to time until September 9, 1907; 13 car loads having been shipped in 1906, and 140 in 1907. However, the lumber was not manufactured within the time specified, and the shipments were so delayed as to cause one of the representatives of the Gage Company to go to the mill in June, 1907, and also in July and September. Certain things were done at these times, which will be mentioned later.

September 7, 1907, one of the creditors of the bankrupt filed a creditors' bill in the Claiborne chancery court, averring insolvency of the Clairfield Company, praying that a receiver be appointed, and that the assets of the company be administered for the benefit of its creditors. On the same date, involuntary proceedings in bankruptcy were begun in the court below against the Clairfield Company, all of which resulted in the appointment in the state court of a receiver, and in the court below of the appellee as trustee in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bankruptcy, who came into possession of the property and assets of the bankrupt. Meanwhile the Gage Company began an action in the nature of replevin in such chancery court, setting up title to certain lumber then in possession of the receiver appointed by the state court and in the yards of the bankrupt. Thereupon an adjustment was effected between the parties to this litigation, whereby the replevin suit was dismissed and an agreement made by which the claim of the Gage Company should be set up and litigated in the bankruptcy proceeding. Later the Gage Company filed a petition in intervention in the court below, stating in substance that the parties had agreed that upon execution of its bond petitioner might remove the lumber claimed by it and submit its claim to the property for the determination of the court below; that the bond had been filed; that on September 6, 1906, the written contract before set out was entered into; that pursuant to that agreement petitioner advanced to the Clairfield Company the sum of $30,000, together with certain other sums, amounting in all to $41,091.05, against which advancements petitioner had received lumber (not including that now in controversy) to the amount of $24,851.32, leaving a balance due petitioner of $16,239.73; that prior to the filing of the creditors' bill in the Claiborne chancery court the Clairfield Company had manufactured expressly for petitioner under the terms of the agreement, and delivered to it "by placing the same on sticks expressly for it under said contract," certain lumber therein particularly described; that such lumber had been paid for and was the property of petitioner; that it was "unlawfully taken in custody by the chancery court of Claiborne county, Tennessee; and that the trustee in bankruptcy has no right or title to the same." The prayer was that petitioner be decreed to be the true and lawful owner of such lumber.[1]

Issue was joined by the answer of appellee; the agreement in effect to substitute a bond for the lumber in dispute and submit the issue for trial in the court below was admitted; counterclaim and set-off were alleged respecting the claim of petitioner for $16,239.73 for moneys advanced by petitioner to the Clairfield Company on purchases of lumber, and in excess of the sum due for lumber actually received; a preference was also averred through the transfer of seven car loads of lumber represented by the second sum of money in dispute in the present case; and praying that the various controversies between the parties be consolidated and heard together, that petitioner's claim, before mentioned, be re-examined and disallowed, unless petitioner should surrender the amount of such preference.

C. L. Marsilliot, of Memphis, Tenn. (Walter C. Chandler, of Memphis, Tenn., of counsel), for appellant.

Jouett & Jouett, of Winchester, Ky., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. [1] The lumber represented by the two sums of money in dispute was admittedly manufactured and placed on sticks—that is, was piled in the yards of the Clairfield Company—prior to the bankruptcy. We agree with the learned trial judge in the conclusion that the title to the lumber did not pass; but we have not been satisfied that this conclusion is determinative of the case. Indeed, we were so strongly impressed with this doubt that we requested counsel for the respective parties to submit briefs, and they have done so, upon the question in substance whether at the time of the bankruptcy the Gage Company had acquired an interest in the lumber in the nature of an equitable lien, which was enforceable against the trustee of the bankrupt, within the principles laid down in Sexton v. Kessler,

---

[1] Amendment and testimony touching alleged collateral oral agreement need not be mentioned or passed upon under present view of the case.

225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995, Hurley v. Atchison, To-
peka & Santa Fé Ry., 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729,
and kindred decisions.

[2] We are disposed to believe that this question must be answered
in the affirmative. It was thrice stated in distinct terms in the contract
that the Clairfield Company should, during the three months in which
the advances were to be and in fact were made, "put on sticks" quan-
tities of lumber worth at least the sums of such advances respectively
"to apply on our contract." We think the provisions for making ad-
vances toward the manufacture of particular lumber and for stacking
it "to apply on our contract" disclose an intent to create a loan and
security, as well as an ultimate sale, and so as between the parties to
place the transaction outside of the ordinary category of unsecured
claims. The contention that the lumber was to be inspected, measured
and placed on cars at the yards is not important in the view we take
of the case. At most, inspection and loading were for the benefit of
the Gage Company and might have been waived by it (Van Winkle v.
Crowell, 146 U. S. 42, 49, 13 Sup. Ct. 18, 36 L. Ed. 880; Belding-Hall
Manufacturing Co. v. Mercer & Ferndon Lumber Co., 175 Fed. 335,
339, 99 C. C. A. 123 [C. C. A. 6th Cir.]); and measurement was simply
to ascertain the amount to be charged against the advances (Leonard
v. Davis, 66 U. S. [1 Black] 476, 483, 17 L. Ed. 222).

We do not understand that there is any substantial dispute touching
the means of identifying this lumber as it stood in piles in the yards.
It was distinctive in kinds and dimensions, and the witnesses seem to
be in harmony as to the fact that it was manufactured for the fulfill-
ment of this contract. The general manager of the Clairfield Company
forwarded monthly lists showing the lumber "put on sticks to apply on
this contract." No other lumber like this appears to have been in the
yards. This was made plain when an accredited representative of the
Gage Company visited the yards in June, July, and September, 1907
(prior to the bankruptcy), and easily identified the lumber, examined it;
and gave repeated orders to have it shipped, even stating in respect of
the lumber, as testified to by the general manager of the Clairfield Com-
pany:

"Ship it green, and it will be our loss if it stains in the car, as the lumber
had only been on sticks a short time."

Concededly the required inspection and loading on cars were not
waived, but the identity of the lumber and its fitness to apply on the
contract were complete.

What, then, were the rights of the parties to the contract? Plainly
the Gage Company advanced its money and was to be repaid in lumber
of specified kinds, dimensions, and qualities. At the date of the con-
tract the lumber had not been manufactured; but the contract required
its manufacture, and its distinctive character identified it with its pur-
chasers. The provision of the contract obligating the Gage Company
only "to pay half cash on each invoice as rendered, the balance to ap-
ply on the payment of the notes given," cannot affect the present ques-
tion. Upon the theory that title to the lumber passed to the Gage Com-
pany—that is, on the current deliveries it was simply receiving its own

property—there was no occasion to pay anything, and each of these 50 per cent. payments was a new advance; but, treating the contract as one of equitable lien, this complication disappears, and the original advances, so far as unpaid, always remained a lien on all the undelivered lumber manufactured thereunder. The advances accumulated, as we understand the fact, through the failure of the Clairfield Company to manufacture and ship the lumber as fast as the advances were made.

A court of bankruptcy views transactions of this kind upon the broadest equitable principles, and does not hesitate to effectuate the actual intent of transactions honestly had with a bankrupt, without much restraint as to formality or procedure. Hurley v. Atchison, Topeka & Santa Fé Ry., supra, 213 U. S. at page 132, 29 Sup. Ct. 466, 53 L. Ed. 729, approving language of Circuit Judge Putnam. When we regard the substance and effect of the present transactions, apart from their form, it is reasonably plain that the Clairfield Company would not be heard to say that the Gage Company did not, through its advances and the other company's actual production and stacking of the lumber, acquire an interest, certainly an equitable interest, in this lumber. The essence of the purchaser's right was the fact, constantly to be remembered, that each advance was made for the very purpose of having a particular thing produced. The last analysis of such a transaction is that, when the lumber was produced and placed on sticks, it was in effect appropriated toward the payment of the loan as required and promised under the contract.

It is true that, in the negotiations leading up to the contract, efforts were made, which failed, to have the lumber as it was piled marked with the name of the Gage Company, also to have a lease made to that company of part of the yard upon which to set aside the lumber as it was manufactured; the representatives of the Clairfield Company expressing, as to the one plan, fears that it would injure the credit of the company, and, further, that they did not wish Mrs. Anderson, the president of the company, to know of the advances, and declaring in respect of the latter plan that the company held the property under lease and had no right to sublease. But (aside from any question of admissibility of such statements) these features of the negotiations concerned an endeavor of the Gage Company to secure a transfer to it of the *title* to the lumber as fast as it was produced; and while it must be conceded that in one sense such statements would seem to be opposed to a purpose to create an equitable lien, yet no charges of fraud or bad faith are made respecting either the negotiations or the contract, and, since the contract was admittedly entered into in the form pointed out, it must be construed. To say, then, that such antecedent negotiations are inconsistent with the idea of an equitable interest in the lumber, is to urge that the repeated use of the words "to put on sticks to apply on our contract" is meaningless; in a word, it is to destroy the most significant portions of the contract. And as to the effect upon creditors of an equitable lien, as distinguished from a formal and published lien, this contention at last amounts to a challenge of the soundness of the doctrine of York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, and of all the decisions affirming

and settling its principles. To illustrate, as respects creditors failing to fasten a lien on the bankrupt's property, that doctrine enforces instruments which have not been published by filing or recording as required by law.

The nature of an equitable charge or lien, and the principles upon which the courts proceed in fastening such charges upon the objects intended as security, are so familiar that we are content to cite only a few of the leading decisions. In Hurley v. Atchison, Topeka & Santa Fé Ry., supra, a mining company had contracted to mine and deliver coal sufficient to meet the current needs of the railroad company, but through financial embarrassment was unable to do so; and in order to assist the mining company to keep its agreement, the railroad company furnished the mining company with money in advance of the agreed time of payment, and it was held that this implied (213 U. S. 134, 29 Sup. Ct. 466, 53 L. Ed. 729)—

"a purpose that the coal as mined should be delivered, and is from an equitable standpoint to be considered as a pledge of the unmined coal to the extent of the advancement."

This was not because of the intervention of bankruptcy or of the trustee's continued performance of the parol agreement previously made between the mining company and the railroad company, as counsel for the Clairfield Company urge. It was in consequence and in recognition of the previous parol agreement. Justice Brewer there distinctly approved language of the Court of Appeals, which is pertinent here:

"The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to pledge (set apart) a sufficient amount of coal after it should be mined as security for the payment of advances made. This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it, and to treat it as creating an equitable charge or lien, however inartificially it may have been expressed."

See Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453, 41 L. Ed. 865; Ingersoll v. Coram, 211 U. S. 336, 368, 29 Sup. Ct. 92, 53 L. Ed. 208; Fourth Street Bank v. Yardley, 165 U. S. 634, 644, 17 Sup. Ct. 439, 41 L. Ed. 855; Ketchum v. St. Louis, 101 U. S. 306, 316, 25 L. Ed. 999; Barnard v. Norwich & Worcester Railroad Co., 4 Cliff. 351, 365, Fed. Cas. No. 1,007 (per Justice Clifford). See, also, Howard v. Delgado & Co., 121 Fed. 26, 57 C. C. A. 270 (C. C. A. 5th Cir.), and citations.

We do not see that these decisions are met by those relied on by appellee's counsel. It is enough to say that we do not regard his citations as relevant.

Nor do we think the proceeding in the Claiborne chancery court operated to vest in the general creditors of the Clairfield Company any better right than that company itself had against the Gage Company;

for, while the petition in bankruptcy is not included in the record, Judge Cochran said in his opinion below (194 Fed. 182):

"On the same day that the petition in bankruptcy was filed, insolvency proceedings against the bankrupt were begun in the proper state court of Tennessee, and one J. H. Bartlett was appointed receiver therein. September 9th he took possession of the assets of the bankrupt, including all its lumber stacked in its yard at Clairfield. * * * Upon the appointment of McEldowney as trustee in bankruptcy, the receiver surrendered possession of the lumber taken possession of by him, including that claimed by the Gage Company in its action of replevin, and the other assets of the bankrupt to him, and by consent the assertion of its claim thereto was transferred to this court."

[3] As regards the time of the commencement of the proceeding in the state court and of the bankruptcy proceeding, counsel for the Clairfield Company agrees with Judge Cochran, although counsel for the Gage Company says that the bankruptcy proceeding was begun two days later. We think we should accept the statement of the court. It is settled (Acme Harvester Co. v. Beekman Lum. Co., 222 U. S. 300, 307, 32 Sup. Ct. 96, 99 [56 L. Ed. 208]) that:

"The filing of the petition [in bankruptcy] is an assertion of jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. The exclusive jurisdiction of the bankruptcy court is so far in rem that the estate is regarded as in custodia legis from the filing of the petition."

Moreover, the transfer of the controversy between the two lumber companies to the bankruptcy court seems to have been for the purpose of testing the rights of those companies as they stood before either of the proceedings mentioned were commenced. These facts distinguish the present case from that of Cincinnati Equipment Co. v. Degnan, 184 Fed. 834, 107 C. C. A. 158 (C. C. A. 6th Cir.).

[4] It scarcely need be said any more that a trustee in bankruptcy, before the amendment of 1910, stood no better than the bankrupt. The same rule prevails in Tennessee as respects the rights of an assignee for the benefit of creditors (Stainback v. Junk Bros., 98 Tenn. 307, 319, 39 S. W. 530); also of a receiver as to prior equities (Johnson v. Tucker, 2 Tenn. Ch. 398, 401). It follows that the rule of York Manufacturing Co. v. Cassell, supra, which originated in Ohio, is applicable here; so of In re Huxoll, 193 Fed. 851, 856, 113 C. C. A. 637 (C. C. A. 6th Cir.), which arose in Michigan; so, also, of Toof v. City Nat. Bank of Paducah, 206 Fed. 250, coming here from Kentucky, decided June 3, 1913. And as Justice Brewer said in Hurley v. Atchison, Topeka & Santa Fé Ry., supra, 213 U. S. 134, 29 Sup. Ct. 469, 53 L. Ed. 729:

"The equitable rights of the parties were not changed by the commencement of bankruptcy proceedings. All obligations of a legal and equitable nature remained undisturbed thereby. If there had been no bankruptcy proceedings, the coal as mined was, according to the understanding of the parties, to be delivered as already paid for by the advancement."

[5] As to the claim and the holding below that the seven car loads represented by the second sum of money in dispute amounted to a preference within the meaning of section 60 of the Bankruptcy Act of July

1, 1898, c. 541, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), it is to be said that, although this portion of the lumber was shipped as late as September 9, 1907, the rights of the Gage Company had their origin in the contract of September 6, 1906, and, so far as we can discover, became effective as early as those respecting the other lumber; and it is to be borne in mind that no issue of bad faith is involved. The theory of the decisions, before cited, is that the trustee receives the property of the bankrupt subject to the liens equitably chargeable against it, and, as respects their enforcement, stands in the shoes of the bankrupt. Furthermore, besides its general application to the instant case, the decision in Sexton v. Kessler, supra, we think, rules this case so far as the alleged preference is concerned. See, also, Belding-Hall Manufacturing Co. v. Mercer & Ferndon Lumber Co., 175 Fed. 335, 339, 99 C. C. A. 123 (C. C. A. 6th Cir.); Union Trust Co. v. Bulkeley, 150 Fed. 510, 516, 517, 80 C. C. A. 328 (C. C. A. 6th Cir.); 1 Loveland on Bankruptcy (4th Ed.) § 478.

The decision below must be reversed, with costs, and the case remanded for further proceedings in accordance with this opinion.