## SULLIVAN *v.* MYER.

## (*Nashville.* December Term, 1916.)

1. **BANKRUPTCY.** **Preference.** **Sale of stock of merchandise.** **Insurance money.**

Where defendant sold his stock of goods to subsequent bankrupts, taking notes, the bankrupts agreeing to keep the stock insured for defendant's benefit, the policies of insurance taken out being on their face made payable to defendant as his interest might appear, but the bankrupts keeping them themselves, and where a fire occurred, and the insurance money realized on compromise was paid over to defendant, who, after taking the amount due himself, paid over the residue to the bankrupts, against whom the petition in bankruptcy was filed soon after, the trustee in bankruptcy was not entitled to recover the insurance money retained by defendant as a preference within four months, since the issuance of the policies under the circumstances as made payable amounted to an assignment *pro tanto*, though defendant had no interest in the property insured, and though the policies were not delivered to defendant; the fact that some of the policies were renewed within the four months prior to the filing petition not defeating defendant's security, since, under the contract for the sale of the stock of goods, when the bankrupts took renewals of policies, the renewals fell at once into the place of the old policies, it not being necessary that the merchants dealing with the bankrupts have notice of the assignment. (*Post*, *pp.* 411-414.)

Cases cited and approved: Donaldson v. Ins. Co., 95 Tenn., 280; Sexton v. Kessler & Co., 225 U. S., 90; McLin & Henry v. Wheeler, 37 Tenn., 687; Daniels v. Pratt, 74 Tenn., 443; Nelson v. Trigg, 75 Tenn., 69; Hutchins v. Watts, 35 Vt., 360; White v. Kilgore, 77 Me., 571; Johnson v. Root Mfg. Co., 241 U. S., 160; McGuffey v. Johnson, 77 Tenn., 555; Johnson v. Donohue, 113 Tenn., 446; Spring v. South Carolina Ins. Co., 8 Wheat., 268; McDonald v. Daskam, 116 Fed., 281; Radford Grocery Co. v.

Sullivan v. Myer.

Powell, 228 Fed., 1;  In re Little River Lumber Co., 92 Fed., 585; Duplan Silk Co., v. Spencer, 115 Fed., 689;  Gage Lumber Co. v. McEldowney, 207 Fed., 255.

2.  BANKRUPTCY.  Preference.  Lien for present consideration.
An assignment of insurance policies on a stock of goods, made for a present consideration, the stock of goods sold, fell within the protection of Bankruptcy Act July 1, 1898, chapter 541, section 67d, 30 Stat. 564 (U. S. Comp. St. 1913, section 9651), providing that liens given or accepted in good faith, and not in contemplation or in fraud of the act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall to the extent of the present consideration not be affected by the act.  (*Post, pp.* 414-416.)

Cases cited and approved:  In re Busby (D. C.) 124 Fed., 469; Greey v. Dockendorff, 231 U. S., 513;  Carey v. Donohue, 240 U. S., 430;  First Nat. Bank v. Connett, 5 L. R. A. (N. S.) 148; Loeser v. Savings Deposit Bank & Trust Co., 18 L. R. A. (N. S.), 1233.

---

FROM SMITH.

---

Appeal from the Chancery Court of Smith County. —A. H. Roberts, Chancellor.

L. A. Ligon and Louis Leftwich, for appellant. J. R. Aust and W. V. Lee, for appellee.

Mr. Chief Justice Neil delivered the opinion of the Court.

Defendant was formerly a merchant in Carthage, Tenn. Desiring to retire from business, he, in May, 1914, offered to sell his stock of goods to two young

men, Messrs. Bradford and Kennedy, at a heavy
discount, taking their forty-eight monthly notes for
the consideration, running through a period of about
four years. The notes aggregated, in round numbers,
about $9,116. They were to rent his storehouse at
a figure which brought their monthly payments, for
goods and rent, up to $240. According to the terms
they were to keep the stock insured for Myer's
benefit, and so were to protect, or secure, the con-
sideration. These terms were agreed to in writing.
the notes were executed, the stock of goods turned over,
and policies of insurance taken thereon. These
policies were on their face made payable to W. E.
Myer "as his interest may appear." The business
continued for about two years, or until February
9, 1916, when a fire occurred, destroying the whole
stock. During the two years the goods had been
retailed in the usual way, and the stock replenished
from time to time, so that when the fire occurred
they had on hand about $15,000 worth of goods;
but the insurance amounted to only $8,000. The
insurance companies higgled over the settlement of
the loss, and the matter was finally compromised
by the payment of $7,000. The money was paid
over to defendant, Myer, who, after deducting the
amount due himself, $5,684.14, paid over the residue
to Bradford & Kennedy, about $1,500. Soon there-
after a petition in bankruptcy was filed. There was
the usual adjudication, complainant was selected as
trustee, and he brought the present suit against de-

fendant, charging him with having obtained an unlawful preference; it having turned out that Bradford & Kennedy owed debts largely in excess of the balance of insurance money paid over to them by Myer, after deducting the amount of the indebtedness due him, and it appearing that this payment was made to Myer, on his debt, within four months of the filing of the petition in bankruptcy.

Myer knew nothing of the extent of their debts, believed they were prosperous, that they discounted their bills in the manner customary with solvent and prosperous merchants, and had no knowledge that would lead him to a different conclusion, or to put him on inquiry.

These additional facts should be stated with reference to the policies of insurance: The original policies were executed some two years before the fire, but as they expired others were taken, or they were renewed, and the renewal of some of them was within four months of the beginning of the proceedings in bankruptcy. The policies were never delivered manually to defendant, Myer. They were kept in a safe used both by him and by Bradford & Kennedy, to which both had access, Myer using one side, and Bradford & Kennedy the other side; but the policies were placed on that side of the safe which had been appropriated to Bradford & Kennedy. It does not appear that Myer ever had any of these policies in his hands. But it was fully understood between him, and Bradford & Kennedy, and the insurance

companies, that the policies had been made payable to him in the manner already stated for his security.

Were the rights of Myer superior to those of the trustee in bankruptcy, notwithstanding the fact that the money was actually paid to him within the four months as stated? We think they were, and on the following grounds:

The issuance of the policies under the circumstances stated, made payable to W. E. Myer, "as his interest may appear," amounted to an assignment *pro tanto*. *Donaldson* v. *Insurance Company*, 95 Tenn., 280, 32 S. W., 251. It was not necessary that he should have any interest in the property itself which was insured. *Id.* Nor was it necessary that the policies should have been actually delivered to him, to make the assignment perfect. Both he and Bradford & Kennedy were interested in them; the latter, aside from the fact that their debt to Myer was thus secured, because the amount of the policies largely exceeded the amount of debt. They were entitled to retain the policies, and held them for themselves, and in trust for Myer. It is not usual to deliver policies thus made payable, where the insured himself, the owner of the property at risk, has an interest over and above the amount secured to a third party. There is no legal difficulty in the way of an agreement between the parties that one shall hold possession both for himself and another. *Sexton* v. *Kessler & Co.*, 225 U. S., 90, 32 Sup. Ct., 657, 56 L. Ed., 995. It is true that in the case before us it does

not appear there was any such agreement in terms, but the acts of the parties in relation to the policies, and in their dealing with each other at the outset, and in the creation of the security, could mean nothing else; that is, assuming that they were all acting honestly and sincerely. That they were so acting there can be no doubt. Moreover, the facts stated indicate an agreement between Bradford & Kennedy, Myer, and the insurance companies that so much of the policies as would be required to protect Myer should be paid over to him, the assignment thus being perfected by notice to the debtors that it had been made, and to this was added their consent thereto, which, of course, is not usually necessary. *McLin & Henry* v. *Wheeler,* 5 Sneed (37 Tenn.), 687; *Daniels* v. *Pratt,* 6 Lea (74 Tenn.), 443, 447; *Nelson* v. *Trigg,* 7 Lea (75 Tenn.), 69; *Hutchins* v. *Watts,* 35 Vt., 360; *White* v. *Kilgore,* 77 Me., 571, 1 Atl., 739; *Johnson* v. *Root Mfg. Co.,* 241 U. S., 160, 36 Sup. Ct. 520, 60 L. Ed., 934.

There was set apart to Myer an agreed proportion of the fund that would accrue and be in the hands of the insurance companies under the policies in case of fire, sufficient to cover his interest; that is, this proportion of the fund was in advance appropriated to Myer. The policies themselves were only the evidence of the contract, and might well remain in the hands of Bradford & Kennedy until the happening of a fire, if such event should occur. These conclusions find support also in the following authorities,

137 Tenn.—27

in addition to those cited supra: *McGuffey* v. *Johnson*, 9 Lea (77 Tenn.), 555; *Johnson* v. *Donohue*, 113 Tenn., 446, 83 S. E., 360. And see *Spring* v. *South Carolina Ins. Co.*, 8 Wheat., 268, 5 L. Ed., 614; *McDonald* v. *Daskam*, 116 Fed., 281, 53 C. C. A., 559; *Radford Grocery Co.* v. *Powell*, 228 Fed., 1, 142 C. C. A., 457; *In re Grandy* (D. C.), 146 Fed., 318.

Nor will the fact that some of the policies were renewed within the four months defeat defendant's security. *In re Little River Lumber Co.* (D. C.), 92 Fed., 585. When Bradford & Kennedy obtained the goods and executed their notes for the consideration, they agreed, as part of the contract at the time, that they would keep the stock insured for the security of these notes. When they took renewals of policies, the renewals fell at once into the place of the old policies, which had expired, and became subject to the contract—that is, for purposes of security they were mere projections or continuations of the former policies. We cannot doubt that such was the intention of the parties, as evidenced by their conduct. There was not only nothing illegal or immoral in such a transcation, but, on the contrary, only an exhibition of good faith, and respect for the sanctity of contracts. Every one knows that fire insurance policies are issued to run only for stated periods, and that the custom of the business is to renew them as they expire. Under the contract to keep the stock insured for Myer's benefit, nothing else could have been contemplated, nothing else

expected, than that on the expiration of any policy it would be renewed for the same purpose, or another put in its place. Therefore the renewals, not only as between Bradford & Kennedy and Myer, but as to all others who might become subsequently interested in them, including the trustee in bankruptcy, related back to the date of the original agreement. *Duplan Silk Co.* v. *Spencer,* 115 Fed., 689, 53 C. C. A., 321; *Gage Lumber Co.* v. *McEldowney,* 207 Fed., 255, 124 C. C. A., 641.

We think also that, inasmuch as the assignment was made for a present consideration, the stock of goods sold by Myer, it would fall within the protection of section 67d of the Bankruptcy Act of 1898, which provides:

"Liens given or accepted in good faith, and not in contemplation of or in fraud of the act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall, to the extent of such present consideration only, not be affected by this act."

And see *In re Busby* (D. C.), 124 Fed., 469, 470.

It is true that the merchants who were selling goods from time to time to Bradford & Kennedy, in the usual course of their business, had no notice of the assignment of the interest in the insurance policies. Nor was this required. The law of this State requires no registration or recording of such matters. It was only necessary that the insurance company

should have notice (*Greey* v. *Dockendorff*, 231 U. S., 513, 34 Sup. Ct., 166, 58 L. Ed., 339), and its knowledge, which was evidenced by the face of the policies, not only conclusively indicated notice, but an agreement to pay to Myer the proportion assigned to him. There is no hardship to creditors, since they gave credit on the stock of goods, and the business character and integrity of Bradford & Kennedy. It is not shown even that they had any knowledge of the existence of the policies. A decision holding that a *bona fide* assignment, such as was made to Myer, must be subordinated to the rights of the trustee in bankruptcy, as representing creditors, because such creditors had no notice of the assignment, would be a denial of the prior rights obtained under the laws governing the subject of assignments of equitable rights and of choses in action, and would go far to destroy the usefulness of insurance policies as collateral. There is authority, some cases decided in some of the circuit courts of appeals, that seem to go to the extent contended for by the defendant; but the weight of authority is the other way, as will be seen on reading the federal cases we have cited supra. But the controversy seems to be finally settled, in the way we have already indicated, by the very recent opinion of the supreme court in *Carey* v. *Donohue*, 240 U. S., 430, 36 Sup. Ct., 386, 60 L. Ed., 726. A discussion of the opposing theories heretofore prevailing in the United States circuit courts of appeals may be found in the notes to

*First Nat. Bank* v. *Connett*, 5 L. R. A. (N. S.), 148, and *Loeser* v. *Savings Deposit Bank & Trust Co.*, 18 L. R. A. (N. S.), 1233; but this presents an inquiry of little interest, since the conflict has been composed by the supreme court in the case just cited from 240 U. S., 430, 36 Sup. Ct., 386, 60 L. Ed., 726.

There is no error in the chancellor's decree, and it is therefore in all things affirmed.