### SOUTHERN COTTON OIL CO. v. ELLIOTTE.

### In re BEJACH.

#### (Circuit Court of Appeals, Sixth Circuit. November 13, 1914.)

#### No. 2480.

1. BANKRUPTCY (§ 440*)—APPELLATE PROCEEDINGS—MODE OF REVIEW.

An order rejecting a claim in bankruptcy is reviewable only on appeal, under Bankr. Act July 1, 1898, c. 541, § 25a, 30 Stat. 553 (Comp. St. 1913, § 9609); but if the matter partakes of the character of an intervention, presenting a controversy, an appeal may be entertained under section 24a (Comp. St. 1913, § 9608) and section 128, Judicial Code (Comp. St. 1913, § 1120).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915; Dec. Dig. § 440.*

Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. BANKRUPTCY (§ 140*)—RECLAMATION OF GOODS—PROPERTY PURCHASED WITH TRUST FUND—CONFUSION OF GOODS.

Claimant, Southern Cotton Oil Company, made advances to the bankrupt under a specific agreement that the money, which was placed in bankrupt's bank account, should be used to purchase cotton seed to be shipped to claimant. Bankrupt used some of the deposit in his general business. All the seed purchased by him after the advances were made was stored in claimant's warehouse and from time to time shipped to claimant, except a quantity which remained in storage at the time of the bankruptcy, a part of which had been paid for directly from the fund by checks, and an unknown part from bankrupt's store or by the use of his gin. Held that, as the mass of the seed in storage was claimant's, and had been so treated by bankrupt, who had shipped none to others, it should be presumed that the part paid for by him was intended to take the place of the money he had used from the fund, and in any event it became claimant's under the doctrine of confusion of goods, and that in the absence of any state law affecting the question all the remaining seed belonged to claimant as between the parties and as against the trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. § 140.*]

3. TRUSTS (§ 352*)—MINGLING OF FUNDS IN BANK—PRESUMPTION AS TO REMAINDER OF DEPOSIT.

Where it appears that trust funds have been mingled with the general funds of a depositor in a bank, that a certain amount remains in the ac-

---

count at the end of a period, and that the account has not been in the interval depleted below the trust amount, or the final amount, that final amount will be presumed to include the trust money, or to be a part thereof.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 520–525; Dec. Dig. § 352.*]

Appeal from and Petition to Revise an Order of the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

In the matter of F. Bejach, bankrupt; C. H. Elliotte, trustee. Appeal from and petition to revise an order of the District Court, brought by the Southern Cotton Oil Company. Petition to revise dismissed, and order reversed on appeal.

Metcalf & Metcalf, of Memphis, Tenn., for appellant.

C. S. Dashiell, of Memphis, Tenn., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. This case is here on petition to revise and on appeal. In order to receive consideration, the appeal must be thought of as one pertaining to section 24a of the Bankruptcy Law, since more than ten days elapsed after the entry of the order and before filing the petition for appeal, and an appeal under section 25a could confer no jurisdiction on this court.

[1] It is clear also that the petition to revise must be dismissed. Whether the matter sought to be reviewed was a controversy arising in bankruptcy or was a proceeding in bankruptcy is far from clear; but, if it was at all of the latter character, it was an order rejecting a claim, and so could be heard only by appeal under section 25a, and not by petition to revise under section 24b. In re Mueller (C. C. A. 6) 135 Fed. 711, 68 C. C. A. 349; In re Loving, 224 U. S. 183, 32 Sup. Ct. 446, 56 L. Ed. 725. The proceeding below partook of the character of an independent intervention, thus presenting a controversy in bankruptcy, and also of the character of a proof of claim, partly secured, thus presenting a matter leading to an appeal under section 25a. It seems unlikely that the distinction, with its important consequences, occurred at any time to any of the counsel. No point is made thereon, and we have examined the question only because we must do it to know that we have jurisdiction. The precise situation is not likely ever to arise again, and it is enough to say we think that, in spite of the serious inconsistencies, the matter may fairly be treated as an independent intervention. See Rode & Horn v. Phipps (C. C. A. 6) 195 Fed. 414, 115 C. C. A. 316. Accordingly we consider the merits as if they arose under an ordinary appeal pursuant to section 128 of the Judicial Code (Comp. St. 1913, § 1120).

[2] Bejach, the bankrupt, had conducted, at Kerrville, Tenn., a general store, cotton gin, etc., and had been in the habit of buying cotton seed. In April, 1910, the Southern Cotton Oil Company, the claimant or intervener herein (hereafter called the Company), loaned Bejach

$1,500, taking his notes therefor, and they made a written agreement by which Bejach could store in the Company's warehouse, at Kerrville, his cotton seed, and by which he agreed "to ship all of his seed to the Southern Cotton Oil Company at equal prices with other buyers; seed to be sold to others only after giving the Southern Cotton Oil Company refusal"—and agreed to pay storage for use of the seedhouse for seed which might be sold to others than the Company. The money then loaned was for general use by Bejach, and was so used by him in his general business. The cotton seed season opened in September, 1910, and Bejach began at once to apply to the Company for advances of money with which to buy seed. It made these advances by check, some of which were sent directly to him, and by him put into his account in a Memphis bank, and some of which were deposited by the Company to his credit in that account. Each of these checks bore, stamped upon its face, the words, "To be used only for the purchase of cotton seed, which seed must be shipped only to the Southern Cotton Oil Company." Whatever inference might be drawn regarding Bejach's acceptance of this limitation merely because of his personal use of some of the checks so indorsed, all of the funds now involved were so advanced pursuant to Bejach's letter of October 25th, which said, "Please * * * deposit for me in Manhattan Savings Bank * * * to my credit $2,000, with which to buy cotton seed to be shipped to you," and his letter of November 12th, saying: "I wish that you would deposit at the Manhattan Bank * * * $500 with which to buy seed." While the second letter is not so explicit as the first, the two must be read together, and they establish beyond dispute the fact that these funds were advanced by the Company and received by Bejach for the sole purpose of buying cotton seed to be shipped to the Company. They are quite inconsistent with a general and unqualified title in Bejach to the seed bought with this money, permitting him to ship and sell to whomsoever he wished.

At the time of the bankruptcy there was on hand, in this Kerrville warehouse of the Company, cotton seed of the agreed value of $563.-76. Of this a portion had been purchased by Bejach directly with the money from the special bank deposit; that is, he had paid for the same with his check drawn on that account. Another portion was composed of seed which he had paid for either with goods from his store or with the services of his cotton gin. There is no method of ascertaining how much of the seed belonged in one and how much in the other class. After the bankruptcy, the trustee took possession of this seed, and the present intervention is to recover its value from the trustee. Both the report of the referee and the opinion of the District Judge go upon the theory that to so much of the seed as was purchased by Bejach from the store or from the gin he had full title free from any claim by the Company, and that, since that part of the seed purchased with the so-called trust funds could not be separately identified, it followed that the intervener had no claim against any of the seed.

It is doubtless true that since the amendment of June, 1910, the test to be applied in such a controversy must be whether, under the law of the state, the intervening claimant could have maintained his claim, by

way of title or by way of lien against a creditor levying an execution, but we find no Tennessee statute or decision fairly covering such a situation, and so the question must be decided under general rules.

The matter would be differently presented if it was our duty to assume that the contract of April 11th contemplated and reached such purchases of seed as were made by Bejach in October, out of money furnished under these later special limitations. It is perhaps a natural first impression that the contract was intended to cover and fix the rights of the parties with relation to all seed which Bejach should buy, either with the money then loaned or with his own money, or with future funds coming from the Company. Even in that view of the facts, the contract provision would seem to be merely an option extended to Bejach, and giving rise to a right on his part only on the happening of a condition subsequent which never did happen, viz., that the Company would refuse to allow the maximum price.

We think the facts do not permit us to approve this first impression. While, if the October advances had been made in general form, it might be presumed that property purchased with them would be within the purview of the April contract, such presumption cannot survive the specific later understanding evidenced by the limitation on the face of the checks and by Bejach's letter. These funds were not to be used to buy cotton seed which Bejach might ship where he wished. They were to be used only to buy seed "which seed must be shipped only to the Southern Cotton Oil Company." The April contract still continued in force over what it purported to cover, viz., Bejach's obligation to "ship all of his seed," and this continued to refer to seed which he purchased with his own money or with money which he borrowed generally from any one. It did not, by anticipation, destroy a later specific contract between him and the Company, fixing their rights and duties regarding the later advances.

In reaching this conclusion, we are not embarrassed by any express finding of fact to the contrary by the referee or by the District Judge. It appears from the record and from the positions taken by counsel in this court that all parties have at all times understood that all of the seed, except an unknown portion, was purchased directly by the use of the special bank deposit, and we think any inference by the referee to the effect that such seed Bejach was at liberty to sell where he pleased was only a conclusion of law. The District Judge said that no question of fact, but only a question of law, was presented to him; and this question seems to have been whether the impossibility of tracing the specific special deposit money into specific seed in the warehouse defeated the intervening claimant's theory of rights.

[3] The limited and special character of the October and November advances, initially constituting them practically trust funds devoted by the agreement of both parties to one special purpose only and entrusted to Bejach for that purpose only, is quite clear—indeed, seems not to be disputed. They did not, as between the parties, lose this character by being deposited in Bejach's general bank account and so mingled with his general funds, even if the Company had known that they were to be so mingled—a condition as to which the record is silent.

Just as it is in such cases presumed, after the fact, that the depositor has drawn out his personal funds, and has not infringed on the trust moneys mingled with his own moneys, so it must be presumed in advance that this honest course is the one which the depositor will take; and when it appears that trust moneys have been so deposited and mingled with the general account, that a certain amount remains in the account at the end of the period, and that the account has not been, in the interval, depleted below the trust amount or final amount, that final amount will be presumed to include the trust money or be part thereof. National Bank v. Insurance Co., 104 U. S. 54, 68, 26 L. Ed. 693; Board v. Strawn (C. C. A. 6) 157 Fed. 49, 51, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100; Empire Co. v. Carroll (C. C. A. 8) 194 Fed. 593, 605, 114 C. C. A. 435; Brennan v. Tillinghast (C. C. A. 6) 201 Fed. 609, 613, 120 C. C. A. 37.

In the present case, if we consider the agreed value of all the seed as a credit on the special deposits, there should have been remaining in the bank deposit and belonging to this fund $432. There actually was on deposit $563; so there was no ultimate impairment. There could have been no intermediate depletion, because no deposits except these special ones were made after October 25th. It follows that, upon this record and as between these parties, the amounts which were from time to time drawn out and invested in this seed which was in the warehouse at the end are sufficiently identified—that is, identified by presumption as payments out of the trust fund—and as the seed which was so purchased was substituted for and stood in the place of the money which had bought it, the fund is sufficiently traced into the seed. This is the necessary result of the decisions of the Supreme Court and of this court to which we have referred. We find nothing in Tennessee to the contrary; and so we do not meet the question whether local decisions would make a rule of law so far affecting a creditor's right to levy that they would be obligatory upon the federal courts.

To the proposition upon which the case seems to have been decided below, viz., that although part of the seed was a substitute for the trust money, yet plaintiff could not recover because that part could not be identified, there seem to us to be two answers: One grows from the fact that the body of the seed in the warehouse was primarily characterized as seed purchased for and devoted to shipment to the Company. During the season up to this time many car loads had been purchased and so shipped. The Company had advanced for that purpose more than $6,000 before the advances of the $2,500 of October 25th and November 12th. Bejach had not shipped any seed anywhere else, and had not, apparently, ever contemplated diverting any of it. Indeed, such of the seed in dispute as was on hand November 12th only escaped shipment to the Company because the car then sent proved unexpectedly not large enough to hold it all, and this was "left over." The suggestion that the Company and Bejach were merely debtor and creditor, and that Bejach had the entire title and interest in the seed he bought with this money, can hardly survive the test of a supposed loss by fire. If, in such case, he had been sued by the Company as for money loaned, he could have truthfully answered:

"I received the money from you to buy seed for you. I spent it for that purpose, and stored the seed in the agreed place, awaiting shipment to you. I have made no default."

Such answer would seem to be a complete exoneration. Nor can it survive the test of applying the law forbidding preferences. If Bejach, being insolvent, had, within four months of adjudication, delivered to the Company seed which he had so purchased with these advances, would it have been an unlawful preference? If not, it must be because the Company had an interest in the seed entitling it to have the shipment made; and that it had such interest, and that in this conduct there would have been no preference, is the necessary result of Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; and Sexton v. Kessler, 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995. For these reasons, we think it clear that the character of the general mass was clearly fixed, and if Bejach had mingled with it some of his own seed, unidentifiable and undistinguishable, the doctrine of confusion of goods, as we have applied it in analogous cases, would cause his personal contribution to take the character of the mass. Holder v. Bank (C. C. A. 6) 136 Fed. 90, 92, 68 C. C. A. 554; Smith v. Township of Au Gres (C. C. A. 6) 150 Fed. 257, 260, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876. The cases here cited, as well as those referring to a bank deposit, do not lose their analogy merely because they pertain, as some of them do, to the case of a tort-feasor. The tort only creates the trust; and it is the existence of the trust, not the manner of its creation, which gives rise to the presumption of identity and the rule of confusion of goods.

The other answer (perhaps not really distinct in principle) is that in so far as Bejach had used otherwise than for buying seed any of the special deposits, and then had put into the warehouse seed which he had purchased out of his store or gin, he was clearly only doing his duty by making good the deficiency in this special fund or in the substitute special property which had resulted from his unlawful temporary devotion of some of the special fund to his general business. This presents a situation substantially like that considered by the Supreme Court in Gorman v. Littlefield, 229 U. S. 19, on page 25, 33 Sup. Ct. 690, on page 692 (57 L. Ed. 1047), and makes pertinent the comments of Mr. Justice Day:

"Furthermore, it was the right and duty of the broker, if he sold the certificates, to use his own funds to keep the amount good; and this he could do without depleting his estate to the detriment of other creditors who had no property rights in the certificates held for particular customers. No creditor could justly demand that the estate be augmented by a wrongful conversion of the property of another in this manner or the application to the general estate of property which never rightfully belonged to the bankrupt. * * * We think there should be no presumption that the stock was stolen or embezzled with intent to deprive the rightful owner of it, and when the unclaimed shares are found in possession of the bankrupt it is only fair to accept the general presumption in favor of fair dealing and to decide, in the absence of countervailing proof, that the broker out of his funds has supplied the deficiency for the benefit of his customer, which he had a perfect right to do."

It does not seem necessary to decide the full nature and extent of the claimant's right to this seed; it is sufficient to say that it was su-

perior to any right vesting in the trustee. The case presents most, if not all, of the features of a purchase by an agent, with the principal's money, of property for the principal, and the title to which at once vests in the principal, with the right in the agent to receive compensation, measured, perhaps, by the difference between the maximum market price and the price at which he was able to buy; but in any event the intervener would have a clear equitable right to demand, as against a levying creditor or the trustee, that the property be devoted to the purpose to which, as between the parties, it always had been devoted, and it is now immaterial whether this right be called the title, a trust, or an equitable lien. Liens of that character are enforced under the Bankruptcy Act, where their recognition does not involve interference with any applicable state statute. We considered this subject fully in Gage Co. v. McEldowney, 207 Fed. 255, 258, 124 C. C. A. 641.

The order must be reversed, and the case remanded, with instructions that the trustee pay to the claimant the value of the seed in controversy. The appellant will recover costs.