## TOLEDO & C. R. CO. v. CINCINNATI, I. & W. R. CO.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1919.)

Nos. 3269, 3270, 3282–3284.

1. EVIDENCE ⬤73—PRESUMPTION—PERFORMANCE OF DUTY.

A corporation which owned all of the stock of another corporation cannot complain of the presumption that it duly performed its duty as to management.

2. RAILROADS ⬤144(1)—CONSOLIDATION—TRUST FUNDS—IDENTITY.

Where a railroad company, which owned all the stock of and operated a second company, received a sum of money on condemnation of terminal of second company, and purchased new terminal facilities, with the understanding that it should take title in its own name, because all of the property of the second company, including after-acquired property, was subject to mortgage, *held*, in view of the understanding between the companies, that the identity as a trust fund of funds derived from condemnation of the second company's terminal facilities was not lost, where the dominant company at all times had in its treasury a fund large enough to cover that one.

3. TRUSTS ⬤84—RESULTING TRUST—CREATION.

Where a railroad company, which owned all the stock of and operated a second company, after receiving damages for condemnation of terminal property of the second company, purchased new terminal facilities, taking title in its own name, as the property of the second company was subject to a mortgage including after-acquired property, and, neither company having sufficient funds to pay outright for the new terminal, property had to be mortgaged, *held* that, under the circumstances, a resulting trust in favor of the second company arose, under Burns' Ann. St. Ind. 1914, §§ 4017, 4019.

4. RAILROADS ⬤144(1)—COLSOLIDATION—MORTGAGE DEBT.

Where two railroad companies, which were dominated by a third, which owned all of their common stock, were consolidated, and the third company received shares of the new company to take the place of those of the two constituent companies, and on the books marked off indebtedness due it from such companies, *held*, in view of the fact that the two constituent companies never earned operating expenses, that the act of the third company was a mere cancellation, and not a payment, of debts which they owed it, so that, on foreclosure of a mortgage on the property of one of the constituent companies and reorganization, the third or dominant company could not be required to pay off mortgage on terminal property bought for such company, title to which was held in trust by the third company, on the theory the cancellation of indebtedness, including amount of mortgage indebtedness, which constituent company, as between the companies, was primarily bound to pay, was a payment.

5. RAILROADS ⬤144(1)—CONSOLIDATION—LIABILITY FOR MORTGAGE DEBT.

Where a dominant railroad company, which controlled another company, purchased terminal facilities for it, to take the place of facilities which had been condemned, and took title in its own name, so that a mortgage on the property could be given, the property of the subsidiary

company being subject to a mortgage including after-acquired property, *held*, that the subsidiary company was primarily liable for payment of debt, and, on foreclosure of mortgages on the property of both companies, the receivers of the dominant company were entitled to reimbursement for payments it had made on the terminal property in excess of the funds derived from condemnation of property of the subsidiary company.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

In the matter of the receivership of the Cincinnati, Hamilton & Dayton Railway Company, and foreclosure proceedings against the Cincinnati, Indianapolis & Western Railroad Company. From decrees foreclosing mortgages and adjusting equities, the Toledo & Cincinnati Railroad Company appeals, as do Judson Harmon and Rufus B. Smith, as receivers of the Cincinnati, Hamilton & Dayton Railway Company, the company itself, and the Cincinnati, Indianapolis & Western Railroad Company and others. Decrees and orders in part affirmed, and in part reversed, and causes remanded for the purpose of entering a modified decree.

Prior to June 30, 1899, the Cincinnati, Hamilton & Dayton Railway Company (hereafter called the C., H. & D.) owned and operated a railroad from Cincinnati, through Hamilton, to Toledo. The Cincinnati, Hamilton & Indianapolis Railway Company (hereafter called the C., H. & I.) owned the line from Hamilton to Indianapolis, and the Indiana, Decatur & Western (hereafter called the I., D. & W.) owned the line from Indianapolis to Springfield, Ill. The C., H. & D. owned all the stock of the C., H. & I. and the I., D. & W., and was actually operating these roads, either as lessee or as agent for the owners. On August 31, 1902, the C., H. & I. and the I., D. & W. were merged into a new corporation, the Cincinnati, Indianapolis & Western (hereafter called the C., I. & W.). The C., H. & D. likewise owned all the stock of the C., I. & W., and operated that road. The C., H. & I. had been incumbered by a general railroad bond mortgage covering after acquired property, and these mortgage bonds were taken up through a corresponding issue by the C., I. & W. All the C., H. & D. properties were likewise subject to a general mortgage. In October, 1914, foreclosure was pending in the court below of mortgages covering both the C., H. & D. and the C., I. & W. properties. Receivers were appointed, and, as the result of these and other foreclosure proceedings, the two systems were divorced. The C., H. & D. bondholders bought in all the property which belonged to that road, and reorganized as the Toledo & Cincinnati Railroad Company (hereafter called the T. & C.). The bondholders of the C., I. & W. purchased all of its properties and reorganized as the Cincinnati, Indianapolis & Western Railroad Company (hereafter called the new C., I. & W.).

Prior to June 30, 1899, the C., H. & D. had purchased certain terminal property in Indianapolis, which has become known as the "bulking yards." It took the title thereto in its own name, and raised $60,000 of the cost by a mortgage thereon, given to an insurance company, payable $2,000 per year. These yards were for the use of that part of the C., H. & D. business which was being conducted upon the C., H. & I. tracks, and the cost thereof was, on the books of the C., H. & D., charged to the C., H. & I. The legal title has never been conveyed by the C., H. & D., excepting as it has passed by foreclosure to the T. & C. Pending the foreclosure proceedings, a dispute arose between the C., H. & D. interests and the C., I. & W. interests as to the ownership of these yards, and, in the different foreclosure decrees, the question was reserved. November 30, 1915, an agreement was made between the new C., I. & W., on the one side, and the receivers of the C., H. & D., on behalf of themselves and the then about to be organized T. & C., by which agreement the value of the yards was fixed at $96,576, and it was provided that, if it should finally be adjudged that

the yards belonged to the C., H. & D. interests, they would sell the property to the new C., I. & W., and it would purchase for that sum, less any payments which the court might find had already been made by the C., I. & W. interests.

In settlement of all branches of this controversy, and as supplementary to the foreclosure decrees, the court below found that it had been the duty of the C., H. & D. to convey title to the yards upon payment to it of the cost price thereof; that this cost price had been fully paid; that thereupon the C., H. & D. should have conveyed the unincumbered title; that the title should now be conveyed, but that, since the new C., I. & W. would be compelled to pay that portion of the insurance company mortgage remaining unpaid, the new C., I. & W. was entitled to a money judgment against the C., H. & D. for this amount. From a decree in accordance with these findings, the matter was brought to this court by five appeals and cross-appeals. In No. 3282, the T. & C. appeals, because the property is taken away from it without payment; in No. 3283, the C., H. & D. receivers appeal, because they are not allowed to charge the new C., I. & W., as a condition of the transfer of the title to it, the amount of the serial payments which they made on this purchase-money mortgage out of receivership funds while the property was under their management; in No. 3284, the C., H. & D. complains of the money judgment against it; in No. 3269, the new C., I. & W. complains because it did not have a money judgment against the T. & C., as well as against the C., H. & D., for the amount of these future payments; and, in No. 3270, the new C., I. & W. appeals, because the receivers were not compelled to take up the remainder of the mortgage, and thus convey free - of incumbrance. The various appeals involve other complaints also, but enough have been stated to differentiate.

Morison R. Waite, of Cincinnati, Ohio., for appellants and cross-appellees.

Murray Seasongood, of Cincinnati, Ohio, for appellees and cross-appellants.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). 1. The bottom question is whether there was, originally, any enforceable duty to convey title to the C., H. & I., and, if so, upon what condition? The question may be made concrete by supposing that in 1900 the C., H. & D. and the C., H. & I. interests had been separated, and the C., H. & I. had paid or offered to pay the amount which the C., H. & D. had invested, and thereupon had demanded a deed; would the courts have compelled that conveyance?

[1-3] A more detailed history of the purchase is this: In 1897, the C., H. & D. was operating the C., H. & I. for the account of the latter road. The intention had been that the relations should be those of lessor and lessee; but the formal lease, which had been prepared for that purpose, had been abandoned before 1897. The C., H. & D. charged against the C., H. & I. everything expended in the operation or maintenance of the road, and credited to the same account all the income received. A change in the grade of the city streets seriously impaired the value of the C., H. & I. freight terminal in Indianapolis. Damages on this account were finally assessed at $32,000, and this sum was paid to the C., H. & D. in October, 1897. This money was plainly the property of the C., H. & I., and the voucher therefor was payable to the two roads jointly; but, like ordinary operating income, it was taken by the C., H. & D., mingled with its own funds, and merely

credited to the C., H., & I. on the general book account. As soon as the injury to this freight terminal, from change in grade, had become imminent, the responsible officers of both railroads began to look about for a substitute. It was found that suitable property in the vicinity could be purchased for an amount first estimated at about $92,000.[1] The C., H. & I. had no funds, except its right to insist that the $32,-000 damages be applied to this purpose, and the C., H. & D. had none to spare, with which to complete the purchase. The C., H. & I. was incumbered by a general mortgage which attached to after-acquired property, and it therefore could not raise the money by mortgage on the new yards. Accordingly it was arranged that the property should be purchased in the name of the C., H. & D., and that $60,000 of the purchase price should be procured by mortgage upon the property, securing 30 notes of $2,000 each, to be made by the C., H. & D. and indorsed by the C., H. & I., and due serially, one each year, commencing December 15, 1899. This arrangement was carried out, and the mortgage loan made from an insurance company, and the remainder of the price, which finally turned out to be about $25,000, was paid by the C., H. & D. and charged in its general account against the C., H. & I.

We have said "Accordingly it was arranged," etc., and we think this is the rightful inference from the testimony, although the previous arrangement is chiefly evidenced by what was done. The case is not the usual one where the act of one party might or might not evidence a previous plan between the two. The two railroads had substantially the same boards of directors and general officers, and the same subordinate officers and employés, so far as the C., H. & I. had any of the latter class. The C., H. & I. did whatever the C., H. & D. directed, and did nothing else. Under these circumstances, and in the absence of any tendency to fraud or unfairness practiced by the dominant corporation against the other, and in the absence of any later disclaimer of the rightfulness of the action, the inference is inevitable that the action taken nominally by one corporation in matters affecting the interest of the other was in the execution of their common plan.

The statutes of Indiana, after providing that a trust shall not result merely on account of the payment, when the purchase price is paid by one person and the title taken in the name of another, further provides that this prohibition of resulting trusts shall not extend to cases—

"where it shall be made to appear that, by agreement and without any fraudulent intent, the party to whom the conveyance was made, or in whom the title shall vest, was to hold the land or some interest therein in trust for the party paying the purchase money or some part thereof." Burns' Ann. St. Ind. 1914, §§ 4017, 4019.

We have no hesitation in concluding that such an agreement as this statute mentions was here made between these two railroads, so far

[1] When the matter was closed, the amount expended was about $85,000; but this was the net amount, after returning to the fund about $7,000, the balance of an appropriation for the purchase, which had been put in the hands of the agent who bought the property.

as concerned the investment of the C., H. & I. money received in exchange for its former terminal. Not only do the circumstances already mentioned point to this conclusion, but it also appears that it was the legal duty of the C., H. & I., under its existing mortgage, to substitute within the lien thereof equivalent property for any which might fall out from under the mortgage, and this duty plainly rested upon the C., H. & D., to the extent of whatever proceeds of such lost property came into its hands. The C., H. & D. cannot complain of the presumption that it performed this duty. There is also the fact that the property was at once listed for taxation as the property of the C., H. & I. and was, with everybody's consent, cut out of the property accounts of the C., H. & D. and put into the construction account of the C., H. & I.

We do not overlook the fact that the C., H. & D., during the years 1898 and 1899, expended considerably more than $32,000 in items which were charged on the C., H. & I. books to its construction account, and which, therefore, should have been permanent improvements. This might or might not be—according to the details, which do not appear in this record—a good answer by the C., H. & D. to a claim that it had wrongfully appropriated this specific $32,000 fund; but it has no persuasive force in determining whether the purchase price of these yards, in excess of $60,000, should be treated as having been made out of the $32,000.

The identity of the fund was not so far lost as to prevent the application of this theory. Here, again, the relations between the parties must be remembered, and the transaction cannot be judged by the same standards applicable to strangers. When the money was received by the C., H. & D., it was not specifically paid out and applied, whereby it later became impossible to apply it to this purpose. There was already a much greater sum due as balance of account from the C., H. & I. to the C., H. & D. Ordinarily the receipt of this money would simply diminish by so much the general balance; but no one claims that the specific fund could rightly be applied for that purpose. There is nothing to indicate that an equal or greater amount did not continually remain in cash in the C., H. & D. treasury, from the time it was received until the final payments were made on account of the new yards, but every reason to suppose the contrary; nor was there anything to prevent an understanding between the parties that the fund should be held by the C., H. & D. until the time came to use it in the intended way. Such an understanding, in connection with the constant presence in the C., H. & D. treasury of a fund large enough to cover this one, would sufficiently preserve the identity of the trust fund, under the standards which this court has approved. Brennan v. Tillinghast, 201 Fed. 609, 614, 120 C. C. A. 37, and cases cited; Southern Co. v. Elliotte, 218 Fed. 567, 571, 134 C. C. A. 295. The testimony is direct and undisputed that the president of the C., H. & D., who in fact dictated the policy of each, approved the early suggestion of a subordinate officer that this particular fund, when realized, should be devoted to this particular purpose.

Nor was there such long delay in using the money as would con-

vince that its identity was lost. The money was received in October, 1897. In July, 1898, about $3,000 was paid for some rights or lands in connection with the new yards, and charged to "C., H. & I. Real Estate," and apparently at about the same time the sum of about $29,000 was put in the hands of a representative of the company for the purpose of buying these yards. Thereafter the general manager of the C., H. & D. returned to the treasury about $7,000, entered on the books as "being balance left in his hands from a trust fund for the purchase of terminal property." These amounts, including the refund, do not precisely equal the $32,000; they overrun it about $1,000, but the coincidence is sufficient, taken in connection with all the facts, to justify the finding that both railroads intended to and did make this purchase of the new yards, to the amount of the excess over $60,000, with the money received from the old station, and that the title so paid for should be held in trust.

[4] It follows that, at the conclusion of this purchase, the C., H. & D. held the legal title in trust for the C., H. & I., but the title was subject to the insurance company mortgage; and it remains to consider the rights and equities of the parties with regard to this incumbrance. In form, this was the debt of the C., H. & D., and the C., H. & I. was only guarantor; but the total amount of the obligation was at once, at the close of the fiscal year, charged on the C., H. & D. books to the C., H. & I., and on the C., H. & I. books was credited to the C., H. & D. It therefore plainly became, as between the parties, the primary obligation of the C., H. & I.; and this relationship continued, without doubt, until August 31, 1902. In the meantime the C., H. & D. paid $6,000 of the principal of the mortgage. Since it had once charged the entire principal to the C., H. & I., as it paid these items they were not charged again; but the interest which accrued on the mortgage and was paid by the C., H. & D. during this interval was charged against the C., H. & I., thus confirming the theory that the duty of payment rested upon the latter road.

On August 31, 1902, there was a consolidation of the I., D. & W. and the C., H. & I. into the C., I. & W., and it is claimed that, at this time, the C., H. & I. paid to the C., H. & D. the $56,000 which then remained unpaid out of the $60,000 mortgage. If this was true, the primary duty, as between the parties, of paying the remainder of the mortgage, was then transferred to, and rested upon, the C., H. & D.; and the court below adopted this theory of payment and the resulting rights. What was the fact as to such payment? Nobody claims that the C., H. & D. got any money at this time. There had been, every year, a deficit in the C., H. & I. operations, and, at this date, the balance which was against the C., H. & I., as a debt to the C., H. & D. was $531,000. This general balance included the $85,000 which had been charged as the price of this property, and thus, in a very fair sense, included the $54,000 which the C., H. & D. had not, as yet, paid upon the insurance company mortgage. The whole plan of merging the C., H. & I. and the I., D. & W. into the C., I. & W. was covered by the reorganization contract to which the C., H. & D. was a party. This contract provided that the C., H. & D., in exchange for its stock (all the

stock) and bonds in the two old companies, should receive stock and bonds in the new company upon a specified basis of exchange. When the transaction was carried out, the $531,000 indebtedness against the C., H. & I. and the similar debt of about $693,000 in favor of the C., H. & D. against the I., D. & W., were canceled. About such cancellation and disappearance of the indebtedness there is no question; but whether the debts were paid is quite another matter.

The evidence of payment is said to be found in the entries made upon the books of the three respective companies; and we have given these entries careful observation. No help is to be had from the entries upon the C., H. & I. books. These books are closed by an entry which is nothing but a summarized trial balance. All the liabilities are set on one side and the assets on the other, and they exactly balance. From this it is to be assumed that the profit and loss account, which was one of the chief assets, was adjusted in order to make this balance. The $531,000 debt appears in this entry as one of the liabilities, but there is nothing suggesting that it was paid, or even eliminated by a profit and loss entry; on the contrary, it was, so far as these books go, allowed to stand as a liability. The books of the C., I. & W. are no more pertinent. The opening entry of the consolidated road shows merely that its capital stock and bonds were issued in exchange for or as against the capital stock and bonds of the old railroads which were united. It gives no information as to this $531,000 debt, but, by its silence, indicates that the new road did not assume or pay this debt. The original entry on the C., H. & D. books is the only one giving color to the claim of payment. This shows only that it had carried among its assets the stock of the two old roads, open accounts against each ($531,000 against the C., H. & I. and $693,000 against the I., D. & W.), and an account which (apparently) represented its loss on bonds sold ($113,000), all carried at the aggregate value of $2,833,000, and that it charged these assets off in exchange for $7,097,000 (par value) of common stock in the C., I. & W. The question, therefore, is whether it should be considered in a court of equity that the C., H. & D., through receiving the common stock in the consolidated company, actually received money or money's worth for the $531,000, so that the subsequent rights of the parties would be the same as if it had been paid over in money, or whether this item was merely charged off and canceled without receiving anything substantial in exchange for it.

Several considerations, as we think, compel the conclusion that there was no real payment, as distinguished from mere cancellation. The first is that there clearly was not, in the mind of any one, any value whatever in this account against a railroad which could not make operating expenses, and the cancellation of the account could not have been intended to be exchanged for anything of substantial value. The second is that the new common stock being received—at least as to any surplus above the value of the old stock surrendered—was apparently as worthless as the account was. The third is that the reorganization agreement provided that the C., H. & D. should have, in exchange for the surrender of its stock in the old companies, precisely the total amount of stock in the consolidated company which it did receive, and

we therefore find a careful declaration by both parties that the new stock was fully paid for by the surrender of the old stock, leaving none of it to apply in exchange for the debt. Clearly, the new consolidated stock, received by the C., H. & D., had an actual value, by representing tangible assets, no greater than the stock of the constituent companies which it surrendered in exchange. The railroad properties of the new company and of the old companies were identical; the mortgage indebtedness was somewhat increased; the financial condition was better only by reason of the disappearance of the $1,337,000 of the floating debt of the old companies; and this had disappeared only because the C., H. & D., the sole stockholder, had charged it off. To say that one who holds all the stock in a corporation, and also holds a debt against it, gets his debt paid by canceling it, and to say this because his stock thereby may become salable for a larger price, is to state an obvious fallacy. To the extent by which the selling price actually received, or the market selling price, is thereby increased, it would be true, but no further.

Some further reasons urged that the debt should be treated as if actually paid we think untenable. One is that the C., H. & D. had the power, under the agreement, to issue the remainder of the common stock of the C., I. & W. for the extinguishment of that road's floating debt; but this never was done. The very fact that the C., H. & D. did not, pursuant to this power, take stock in direct exchange for the $531,000, tends to show that all parties regarded the transaction as the cancellation, and not as the payment, of the debt. Another reason is that the C., H. & D. agreed to sell the bonds of the C., I. & W., and to use the surplus, which remained after retiring the bonds of the old roads, in retiring the floating debts of those roads. But there never was any surplus; instead, there was a shortage; and, anyway, this debt was "retired."

[5] However, it is not necessary to stand on the position that no part of the $531,000 was really paid; we are concerned only with the $54,000, which has an aspect all its own. Whether the $60,000, of which this was the remainder, should be charged to the C., H. & I., when the C., H. & D. first gave its notes for the loan, or should be charged from time to time as the serial payments were actually made, was a mere matter of bookkeeping. To create a debt to the C., H. & D. from the C., H. & I. therefor was not rightful, except upon the theory and the contingency that the notes would be paid by the C., H. & D. There was no fixed and certain equitable obligation, until payment was made. Under what we have found the true theory of the rights of the parties, it was then, as between themselves, the duty of the C., H. & I. to pay this $54,000 to the insurance company. If this theory had been in the minds of the parties, and it had been understood that the yards belonged to the C., H. & I. or the C., I. & W., subject to this mortgage, it would have been a strange thing for the C., H. & D. to shift this obligation to itself. To cancel an uncollectible debt to help out a reorganization is one thing; to agree that the debt shall be thereafter increased by a large amount is quite different. We think that an intent by the C., H. & D. to continue primarily liable for this $54,000

mortgage upon property which it did not own would be so unnatural that it could not be inferred, except from the plainest evidence. To say the least, the tendency of the evidence is the other way. We therefore cannot find in this transaction any such real and substantial payment of this sum to the C., H. & D. as put upon it the duty of paying the mortgage.

Without much doubt, the actual thought of the C., H. & D. officers was to the contrary effect. They expected to pay this mortgage themselves; but this was because they thought they owned the property. We are now dealing with the duties which the law will put upon them after it is determined that they did not own the property; and, so far as we are concerned with their intent, it is with that intent which shall be imputed to them after they are put upon the right basis.

From 1902 to 1913, the C., H. & D. paid the principal sum of $2,000 per year, and also paid the accruing interest. The principal payments it treated as made on its own property; the interest payments, apparently, were treated with reference to the value of the use of the property. If nothing else were involved, the C., H. & D. would be entitled to recover these payments, because they were made under a mistake of fact, and they inured to the benefit of the C., I. & W.; but the record does not permit such recovery. The accounts and liabilities of the parties back and forth up to the time of the receivership necessarily involve innumerable questions not covered by this record. To open this one subject would necessitate opening many others; and, as to all these transactions, as well as to the improvements which the C., H. & D. put upon the property from the time, in excess of the unexpended balance of the $32,000, the parties must be left where they have left themselves.

The situation changes, when the C., H. & D. receivers were appointed. They took possession of the assets in aid of a foreclosure; they had no right to use receivership assets of the C., H. & D. to pay the obligations of the C., I. & W. Under the same mistake of fact as to the ownership of these yards, the receivers paid the annual mortgage installments of $2,000 each for 1914, 1915, and 1916, and also paid $4,455 mortgage interest accruing during the same period. These payments were for the benefit of the C., I. & W., most of them were made after this controversy had arisen, and they should be refunded to the receivers. The facts do not justify the collection of interest upon these payments.

The substantial and net result of our conclusions is that, at the date when the receivers were appointed, the C., I. & W. was entitled to a conveyance of the yards, subject only to the payment by it of the principal and interest payments thereafter accruing upon the mortgage; that it and its successor must, as a condition of receiving now the transfer of title, assume the obligation to make all future payments, and must carry the burden of those payments which it has made, and refund those payments which, since that date, have been made by others. Hence it is evident that the new C., I. & W. is not entitled to any decree for the amount of the mortgage payments which it has made or may hereafter make, nor to any conveyance from the C., H.

& D., the receivers, or the T. & C., except conveyance of the same title which the C., H. & D. had originally received, free from any incumbrance or liens since placed thereon by the holder of the legal title, but subject to the unpaid principal and interest of the mortgage. The contract of November 30, 1915, contemplates a warranty deed only in case it is found that the C., H. & D. owned the yards.

Accordingly, the decrees and orders of the court below as involved in appeals Nos. 3269 and 3270 will be affirmed, and as involved in Nos. 3282, 3283, and 3284 will be reversed, and the cases will be remanded, for the purpose of entering a modified decree in accordance with this opinion. The costs in this court, of all the appeals, will be grouped, and, of the total, the new C., I. & W. will pay one-half, and the receivers will pay one-half.