In re COOK UNITED, INC., Cook-Car, Inc. and Washington Distributors, Inc., Debtors and Debtors-In-Possession.

**LEASED PET DEPARTMENTS, INC., Plaintiff,**

v.

**COOK UNITED, INC., Defendant.**

Bankruptcy No. B84–02537.
Adv. No. B84–0658.

United States Bankruptcy Court,
N.D. Ohio, E.D.

June 14, 1985.

Sandra W. Bixby, Nabhani, Roy & Bixby, for plaintiff.

Allan A. Pines, Theodore J. Krulwich, New York City, John J. Rapisardi, Yonkers, N.Y., Burns Summit Rovins & Feldesman, New York City, for defendant-debtor.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter came on for hearing on the complaint of plaintiff, Leased Pet Departments, Inc. ("Leased Pet"), answer of defendant-debtor, Cook United, Inc. ("Cook"), stipulation of facts filed by the parties and briefs of counsel.

The parties stipulated as follows:

1. On August 25, 1982, Cook and Leased Pet entered into an agreement ("Agreement"), whereby Leased Pet would operate pet departments in 14 of Cook's department stores.

2. The Agreement was the first such agreement to be entered into between Cook and Leased Pet. By its terms it is automatically renewable, and it continues in effect between these parties.

3. As a matter of everyday practice, when a customer desired to purchase an item from Leased Pet's department in a Cook store, the customer paid for such item at a central checkout. At that time, the payment tendered went into the possession of a Cook employee, and a record was made on the cash register tape crediting the payment to Leased Pet under a specific account number.

4. Sales of items from Leased Pet's departments were paid for by cash, credit card or check. On more than one occasion, sales would involve items from more than one department in each Cook store. A certain sale might involve the purchase of goods not only from the Leased Pet department, but also from other departments as well.

5. A Cook employee would obtain a "credit clearance" by telephone on all credit card and check sales. Cook bore the risk of the ultimate collection of each credit card or check transaction it approved. Therefore, the amount forwarded to Leased Pet at the end of each ten-day period may have included proceeds of credit card or check sales, payment for which

may not have been collected by Cook at that time.

6. On a daily basis, Cook forwarded the proceeds of its sales and the proceeds of Leased Pet's sales, together with proceeds of sales from other licensees of each respective Cook store, to a local depository bank. Thereafter, the funds from each respective local depository bank were transferred to a general fund maintained at either Ameritrust of Northeastern Ohio or Chemical Bank, New York, New York.

7. Pursuant to paragraph four of the Agreement, within ten days after the close of each business week (Sunday through Saturday, inclusive), Cook would pay to Leased Pet "proceeds from sales and service transactions" made during the business week, after deducting either the aggregate Cook's license fee and advertising allowance or a specified minimum rent, whichever was greater.

8. During the ten-day period Cook had in its possession the proceeds of all sales, including sales made by Leased Pet, it had total control over those funds and could put such funds to whatever use or purpose Cook deemed appropriate.

9. Uniformly, since the commencement of the Agreement and pursuant to its terms, Leased Pet received an accounting of sales and a payment voucher 10 to 12 days following the close of each business week.

10. Each payment made to Leased Pet was by check drawn on Cook's general funds, and such checks bore no indication that they were being drawn on a trust, escrow or special account. Further, all such checks were accepted by Leased Pet without objection.

11. Leased Pet had no notice that Cook was experiencing financial difficulties until five days after Cook filed for Chapter 11, when Leased Pet was advised that the check dated September 17, 1984, had been returned unpaid.

12. On October 8, 1984, and on October 10, 1984, Cook advised Leased Pet by a series of four letters that the proceeds for the weeks ending September 15, 1984, September 22, 1984, September 29, 1984 and the two days prior to the Chapter 11 filing on October 1, 1984, would be paid "at the direction of the court." The aggregate amount of net proceeds for these periods is $57,812.28. When added to the amount of the returned check, $21,212.97, the total amount at issue in these proceedings is $79,025.25.

Leased Pet contends that cash proceeds from sales made by it and collected by Cook during September, 1984, the month before Cook filed its Chapter 11, should be treated as being held in "trust" by Cook for its benefit.

Leased Pet argues that Cook has no ownership rights in the sales proceeds, and is required by law to remit those proceeds to Leased Pet. The proceeds were turned over to Cook by employees of Leased Pet as proceeds for the weeks ending September 8, 15, 22 and 29, plus September 30 and October 1 proceeds. Leased Pet argues that Cook holds those funds as trustee for Leased Pet. Cook argues it is not a trustee, but a debtor; that the lease does not create a trust, but simply sets up a debtor-creditor relationship with regard to weekly sales proceeds.

Leased Pet argues that Ohio law and the law of this circuit and other circuits do not require separate bank accounts, as long as the funds which are commingled by the "trustee" are easily traceable. Here the funds are so traceable, and the parties do not dispute the amount at issue. According to Leased Pet, these facts, plus the language of the lease that funds are to be held "in trust," create a trust relationship. Leased Pet relies heavily on the case of *Southern Cotton Oil Co. v. Elliotte*, 218 Fed. 567 (6th Cir.1914). In that case, the debtor had received funds from the plaintiff for the sole purpose of buying cotton seed to be shipped to plaintiff. Upon the filing of the bankruptcy petition, the trustee took possession of all seed which the debtor had on hand, and plaintiff sought recovery. The Sixth Circuit held that plaintiff was entitled to recover the value of the

seed in controversy, since the debtor had purchased the seed as agent for the plaintiff, and title immediately vested in plaintiff as principal. This title was held superior to that of the trustee, and despite commingling by the debtor, the plaintiff was held entitled to recover from the mass of seed the value of his contribution. 218 Fed. at 572, 573.

If Cook had in fact acted as the agent of Leased Pet in collecting or handling the sales proceeds at issue here, *Southern Cotton Oil* might be controlling. However, in the context of department store leases, a number of circuit courts, including the Sixth Circuit, have concluded that commingling of funds destroys the possibility of finding a trust. In *Mandel v. Whitmer, (In re Yeager)*, 315 F.2d 864 (6th Cir.1963), the court held that a lease arrangement virtually identical to the lease in the instant case did not constitute a trust. The only difference between the instant lease and the lease in *Yeager* was that the parties in *Yeager* did not provide that funds were to be held "in trust." At least two other circuit courts have held that a provision that funds are to be held "in trust" does not create a trust where the alleged trustee may freely commingle a lessee's sales proceeds with those of other departments. *Carlson, Inc. v. Commercial Discount Corporation*, 382 F.2d 903 (10th Cir.1967); *Chicago Cutter-Karcher, Inc. v. Maley*, 356 F.2d 456 (7th Cir.1965); see also *Wohl Shoe Company v. Elliott*, 388 F.2d 883 (9th Cir.1967).

One circuit court has held, in *United States National Bank v. Blauner's Affiliated Stores, Inc.*, 75 F.2d 826 (3d Cir. 1935), that a lessor who collected and held money for a lessee was acting in a trust capacity. In *Blauner's*, however, the Third Circuit found that the agreements "also provide for a separate account of these items of money collected." 75 F.2d at 826 (quoting *In re Kline*, 7 F.Supp. 850, 851 [W.D.Pa.1934]). It is not clear from either the district court or the appellate court decision whether the "separate account" refers to a separate bank account or a separate set of books with all funds com-

mingled. However, in light of the seeming unanimity of the circuits on this issue, and the ambiguous factual findings by the only "dissenting" circuit, it is clear that the relationship between Cook and Leased Pet was one of debtor-creditor, not trustee-beneficiary. In this case, as in *Chicago Cutter-Karcher, Inc., supra*, "it appears that ... a 'trust' clause has been inserted into a document which otherwise sets up a simple debtor-creditor relationship in an effort to assure the debtor's performance of its obligation and not to create a trust." 356 F.2d at 459.

Since the funds held by Cook are not held in trust, but merely constitute a debt owed by Cook to Leased Pet, this Court holds that the complaint of Leased Pet should be denied, and that Leased Pet has a general unsecured claim in the amount of $79,025.27 against Cook.